REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0168

September Term, 2015

---

NORVEL B. THOMPSON

v.

STATE OF MARYLAND

---

Eyler, Deborah S.,
Wright,
Rodowsky, Lawrence F.
  (Retired, Specially Assigned),

JJ.[1]

---

Opinion by Wright, J.

---

Filed:  August 31, 2016

[1] Judge Christopher Kehoe did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate reports pursuant to Maryland Rule 8-605.1.

A jury in the Circuit Court for Kent County convicted Norvel B. Thompson, appellant, of second-degree assault, reckless endangerment, and possession of a shotgun by a prohibited person.  The sentencing court imposed a prison term of ten years, with two years suspended, for second-degree assault and concurrent sentences of five years for reckless endangerment and three years for possession of a shotgun, to be followed by a five-year period of probation.  Appellant noted this appeal and raises six issues for our review, which we have re-ordered for the sake of clarity:

> 1. Whether the trial court erred by failing to grant Mr. Thompson's motion to dismiss based upon a *Hicks* violation?
>
> 2. Whether the conviction for possession of a shotgun by a prohibited person violated the retroactive restrictions clause of the Maryland Declaration of Rights?
>
> 3. Whether the trial court erred by refusing to propound two *voir dire* questions requested by the defense?
>
> 4. Whether the evidence was sufficient to sustain Mr. Thompson's convictions for the crimes with which he was charged?
>
> 5. Whether the trial judge erred in responding to a jury note?
>
> 6. Whether Mr. Thompson's commitment record must be amended to reflect that he is not required to serve 50% of his sentence before he is eligible for parole inasmuch as he was not convicted of a crime of violence?

For the reasons that follow, we answer the first two questions in the negative.  As to the third question, we conclude that the circuit court abused its discretion in failing to ask one of the requested *voir dire* questions, and, therefore, we vacate appellant's convictions and remand for a new trial.  We shall address appellant's fourth question, but appellant's final two issues are moot.

## BACKGROUND

In the spring of 2014, Karen Somerville and appellant lived at Somerville's residence in Worton, Maryland, as a married couple. On the afternoon of April 2, 2014, Somerville met appellant at a rental car facility to assist appellant in renting a vehicle. Somerville suspected that appellant had been drinking, and she drove to her home, while appellant drove to Philadelphia to pick up a friend. Later that evening, appellant called Somerville and informed her that he had been stopped by police for driving under the influence ("DUI"). When appellant arrived home, he was "in a rage," according to Somerville, and he wanted to drive Somerville's vehicle. Somerville refused, and appellant accused her of calling the police to get him in trouble.

Appellant left the residence for approximately one hour. When he returned, he was complaining about the DUI charge and told Somerville that she did not care. Somerville responded that appellant needed to take responsibility for his actions. Suddenly, appellant rushed at Somerville and shoved her against the wall while choking her. After appellant quickly let go of her, she ran into the bedroom to call the police. Maryland State Police Trooper First Class Mark Kendall responded and removed appellant, but no arrest was made.

Appellant returned to his house the next day. Somerville urged appellant to seek counseling and treatment for his anger management and alcohol problems. Somerville

2

also informed appellant that if he did not seek treatment, "as far as [she] was concerned . . . the marriage was over[.]"[1]

Approximately a month later, on May 3, 2014, Somerville drove to Dover, Delaware, to spend the day with her daughter – Nicole Smith – and grandchildren. Somerville thought appellant would accompany her, but on that morning, he refused to go. Somerville communicated with appellant throughout the day, however. Around 9:00 p.m., Somerville left for home after calling appellant to let him know she was on her way. Somerville also called appellant when she stopped for gas.

Sometime after Somerville departed Delaware, appellant called Smith to ask if Somerville had left. Smith thought this was strange, as appellant had spoken with Somerville just prior to her leaving. Smith called Somerville to advise her about the call and also that appellant did "not sound like himself." Smith was on the phone with Somerville when Somerville pulled up to the house and observed appellant standing outside on the steps. Smith cautioned her mother that "[s]omething's not right with" appellant and that "[h]e's off."

As Somerville exited her vehicle, she asked appellant why he had called Smith and upset her. Appellant, without a word, turned around and went inside the house. Somerville told Smith that she would call back. Approximately ten minutes later, Smith called and asked Somerville to send her some pictures from that day that Somerville had taken with her cell phone. Somerville testified that she had difficulty sending the

---

[1] Indeed, at the time of trial, Somerville had filed for divorce.

pictures, and Smith was giving her instructions. Eventually, Somerville said she would hang up to send the pictures, and Smith should call her when she received them. As Somerville transmitted the pictures, appellant asked her why she was not talking to him. Somerville informed appellant that his "attitude's not right," and she would speak with him when he was ready to have a reasonable conversation.

A short time later, Smith called to say that she had received the pictures. Smith and Somerville continued to chat while Somerville sat on her bed. Then, appellant burst into the room holding a gun. Somerville described the gun as a double-barrel shotgun that she had not seen before.[2] Appellant demanded that Somerville "[p]ut the goddamn phone down," which she did. Smith could still hear the conversation, however. Appellant pointed the shotgun at Somerville and said "I'll blow your f'ing brains out." Somerville told appellant to "[g]et the f'ing gun out of my face." Appellant told Somerville: "You once told me that you feared that a man would take your life. Then I'm gonna be the mf'er that's gonna do it, because I'm gonna blow your brains out." Appellant then stepped closer to Somerville, and she heard the gun make a noise, which she described as a "chhh," which she "perceived [] as a barrel engaging before you take a shot." Somerville asked appellant why he was doing this and pleaded with him not to kill her. Appellant accused her of cheating on him and ignoring him. Somerville stated that she continued to stare at the "two black eyes" of the shotgun as she prayed. When

---

[2] Somerville stated that she owned a 12 gauge single-barrel shotgun. Smith thought her mother owned another 12 gauge single-barrel shotgun at this time, as well.

4

appellant stepped forward again, Somerville was no longer looking down the barrels of the shotgun because they were below her chin.

Then, suddenly, appellant set the shotgun down and laughed. He told Somerville, "[t]his is your word against mine," and he turned and walked out of the bedroom. Somerville grabbed her phone, ran into the bathroom, and locked the door.

Meanwhile, at some point during this event, Somerville's phone dropped the call with Smith. Concerned, Smith called 911. As Smith is a Delaware resident, however, she reached Delaware emergency dispatchers, who gave her the number for their Maryland counterparts. Smith called the Maryland 911 dispatchers and told them about the conversation she overheard. She then called Somerville and told her to call 911; Somerville complied.[3] At a later point, while Somerville spoke with emergency responders, appellant knocked on the bathroom door and asked her to open it, saying he would not do anything to her. Somerville refused.

A short time later, Kent County Police Department Corporal Benjamin Hicks arrived at the residence. Corporal Hicks testified that appellant was surprised to see the officers, and Somerville was "hysterical" and crying. Corporal Hicks recovered Somerville's single-barrel shotgun, but Somerville did not inform officers of the double-barrel shotgun. Appellant left with Corporal Hicks, and Somerville pressed charges the next day. Somerville also filed for a protective order against appellant.

---

[3] The series of 911 calls was played for the jury.

The State charged appellant with second-degree assault for the April 2, 2014 shoving and choking incident, and first-degree assault, second-degree assault, reckless endangerment, and possession of a shotgun by a prohibited person for the May 3, 2014 event. The jury was unable to reach a verdict as to first-degree assault, and the circuit court declared a mistrial as to that count. The court then took a partial verdict as to the remaining charges, and the jury acquitted appellant of second-degree assault as to the April 2, 2014 incident but convicted him of the remaining offenses.

## DISCUSSION

### I. *Hicks* Violation

Prior to trial, appellant's counsel moved for a competency evaluation, which the circuit court granted on August 18, 2014. At a pretrial hearing on September 2, 2014, the court rescheduled appellant's trial for January 26 and 27, 2015, as the parties awaited the results of the evaluation. The evaluation was completed on September 23, 2014. At a subsequent proceeding on October 3, 2014, appellant's counsel raised a motion to dismiss for a *Hicks* violation.[4] The court effectively denied this motion.

Appellant contends that the circuit court erred in denying his motion to dismiss based on *Hicks*. Appellant argues that a competency evaluation is not, as a matter of law, a good cause to delay a trial, and the court was not required to wait five weeks for the

---

[4] *Hicks* refers to the decision of the Court of Appeals in *State v. Hicks*, 285 Md. 310 (1979). In that case, the Court held that the remedy for violation of the statutory speedy trial right, now codified in Md. Code (2001, 2008 Repl. Vol., 2015 Suppl.), Criminal Procedure Article ("Crim. Pro."), § 6-103 and Md. Rule 4-271, was dismissal of all charges. *Hicks*, 285 Md. at 318.

results of the examination and/or mandate that the evaluation be completed by a psychiatrist. Appellant concedes, however, that once he raised the issue of his own competency, the court was required to determine whether he was competent to stand trial.

The State argues that waiting for the results of a competency evaluation – especially one that appellant requested – constitutes good cause to delay a trial. The State contends, moreover, that appellant ought not be allowed to benefit from a delay that he, himself, requested.

In Maryland, a criminal defendant has a statutory right to have a trial within 180 days of the earlier of the appearance of counsel or the first appearance in the circuit court. Crim. Pro. § 6-103(a); Md. Rule 4-271(a)(1). "For good cause shown," however, "the county administrative judge or a designee of the judge may grant a change of the trial date[.]" Crim. Pro. § 6-103(b). *See also* Md. Rule 4-271(a)(1). The Court of Appeals has held that "the time limitation prescribed by the statute and the rule is 'mandatory,' and that 'dismissal of the criminal charges is the appropriate sanction where the State fails to bring the case to trial' within the 180-day period, absent 'extraordinary cause justifying a trial postponement.'" *State v. Huntley*, 411 Md. 288, 290-91 (2009) (quoting *Hicks*, 285 Md. at 318).

This Court has noted that "'[t]he critical order by the administrative judge, for purposes of the dismissal sanction, is the order having the effect of extending the trial date beyond 180 days.'" *State v. Barber*, 119 Md. App. 654, 659 (1998) (quoting *State v. Parker*, 347 Md. 533, 539 (1995)). "'The determination as to what constitutes a good cause, warranting an extension of the trial date beyond the [180-day] limit, is a

7

discretionary one, which . . . carries a presumption of validity.'" *Id.* (quoting *Marks v. State*, 84 Md. App. 269, 277 (1990)). Notably, the appellant has the burden to demonstrate "'either a clear abuse of discretion or a lack of good cause as a matter of law.'" *Moody v. State*, 209 Md. App. 366, 374 (2013) (quoting *State v. Frazier*, 298 Md. 422, 454 (1984)).

In this case, the critical order occurred at the September 2, 2014 hearing. Neither party disputes that the rescheduling of the trial date to January 26, 2015, moved the trial date beyond the *Hicks* time limit.[5] The circuit court implicitly found good cause to move the trial date beyond the *Hicks* limit, stating: "So, given all the different issues, none of which is the State's fault, I think we're stuck with January."[6] The court added at the October 3, 2014 hearing: "[G]iven the fact that the delay we have is through no fault of the State, I'm going to say that's still within *Hicks*."

---

[5] We note, however, that the trial court seemed to indicate at the October 3, 2014 hearing that the *Hicks* time period was "tolled" while the competency evaluation was ongoing. We are unaware of any provision in Maryland statutory or case law that "tolls" the 180-day statutory limit. Some of our sister state courts have held that a statutory time period within which a defendant must be brought to trial is tolled by competency evaluations, but the statutes in those states specifically include tolling language. *See* Colo. Rev. Stat. § 18-1-405(6)(a) (excluding time period wherein defendant is incompetent to stand trial or competency being evaluated from statutory time for speedy trial); *Chester v. State*, 298 So.2d 529, 531 (Fla. Dist. Ct. App. 1974); *State v. McGee*, 126 P.3d 1110, 1112 (Kan. 2006); *State v. Pellegrino*, 577 N.W.2d 590, 599 (S.D. 1998); *Castellanos v. State*, 366 P.3d 1279, 1294-95 (Wyo. 2016).

[6] We note, too, that the State's Attorney's Office for Queen Anne's County substituted for the State's Attorney's Office for Kent County due to a conflict of interest that developed in the latter's office.

The Court of Appeals has held that "[o]nce the issue of a defendant's competency has been raised, the proceedings cannot continue until the trial judge determines that the defendant is competent to stand trial beyond a reasonable doubt." *Kennedy v. State*, 436 Md. 686, 692 (2014) (citing *Peaks v. State*, 419 Md. 239, 252 (2011)). *See also* Crim. Pro. § 3-104. Accordingly, then, once appellant's counsel filed the motion for a competency evaluation, the case could not continue until the circuit court determined that appellant was competent to stand trial.

We agree with the State that complying with Crim. Pro. § 3-104 constitutes good cause to delay the trial beyond the *Hicks* time limit. Although appellant is correct that a determination of competency need not be based on a medical or psychiatric examination, *see Sangster v. State*, 70 Md. App. 456, 464 n.2 (1987), *aff'd*, 312 Md. 560 (1988), a judge may certainly feel that a medical or psychiatric evaluation is helpful to that determination. *See* Crim. Pro. § 3-105(a)(1). Appellant contends that good cause was "lacking" because a competency evaluation was unnecessary. This appears to us to be a baseless argument, given that appellant requested the competency evaluation. *See also Lewis v. State*, 79 Md. App. 1, 17 (1989) (noting that delay in proceedings caused by competency evaluation charged to defendant).

Appellant also contends that there was no good cause to wait five weeks for the completion of the evaluation. Appellant is correct that the circuit court "shall set and may change the conditions under which the examination" is conducted. Crim. Pro. § 3-105(a)(2). We find five weeks, however, to be a reasonable time period to wait for the results of a competency evaluation. Accordingly, dismissal of the charges for a *Hicks*

9

violation would have been inappropriate in this case, and we perceive no error in the court's effective denial of appellant's motion.

## II. The Constitutional Argument

As part of his motion for a judgment of acquittal, appellant argued that the possession of a shotgun charge was unconstitutional as applied to him because it violated the "retroactive restriction" clause of Article 17 of the Maryland Declaration of Rights. Specifically, appellant contends that the conviction that disqualified him from possessing a shotgun occurred prior to the enactment of Maryland Code (2003, 2011 Repl. Vol., 2014 Suppl.), Public Safety Article ("P.S.A."), § 5-205(b), meaning that the enactment of that statute imposed a retroactive restriction on his previous criminal conduct.

The State argued that appellant had failed to adequately present a claim in that he cites no authority for his argument that Article 17 of the Maryland Declaration of Rights differs in application from Article I of the United States Constitution. Alternatively, the State contended that this Court and the Court of Appeals have construed Article 17 of the Maryland Declaration of Rights to have the same application as the *Ex Post Facto* Clause of the United States Constitution, and there has been no *ex post facto* violation in this instance. In short, the State asserted that appellant was fairly convicted of possession of a shotgun after enactment of P.S.A. § 5-205 for post-enactment conduct.

Preliminarily, we find that appellant had complied with Md. Rule 8-504, which required litigants to include argument in support of a position. The State is correct that "'[a]rguments not presented in a brief or not presented with particularity will not be considered on appeal.'" *Wallace v. State*, 142 Md. App. 673, 684 n.5 (2002) (quoting

10

*Klauenberg v. State*, 355 Md. 528, 552 (1999)), *aff'd*, 372 Md. 137 (2002). The State

contended that appellant merely referred to the argument he made at trial, which is

insufficient to present the argument to this Court. *See Monumental Life Ins. Co. v. U.S.*

*Fidelity & Guar. Co.*, 94 Md. App. 505, 544 (1993) (noting that issue is not sufficiently

presented where party merely refers to argument made elsewhere, with one exception

inapplicable to this case). In his brief, appellant had done more than refer to the

argument made at trial, however, and thus this issue had been adequately presented for

our consideration.

Turning to the merits, Article 17 of the Maryland Declaration of Rights provides:

"That retrospective Laws, punishing acts committed before the existence of such Laws,

and by them only declared criminal are oppressive, unjust and incompatible with liberty;

wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or

restriction be imposed, or required." Notably, the Court of Appeals has construed Article

17 of the Maryland Declaration of Rights to be *in pari materia* with the *Ex Post Facto*

Clause of the United States Constitution: that is, they have the "same meaning." *See*

*Khalifa v. State*, 382 Md. 400, 425 (2004).

Accordingly, then, to examine appellant's constitutional claim, we look to the *Ex*

*Post Facto* Clause of the United States Constitution. *See* U.S. Const. art. I, § 9, cl. 3.

Justice Chase, writing for the United States Supreme Court in 1798, discussed the types

of laws that would violate the *Ex Post Facto* Clause:

> "1st. Every law that makes an action done before the passing of the law,
> and which was innocent when done, criminal; and punishes such action.
> 2nd. Every law that aggravates a crime, or makes it greater than it was,

11

when committed.  3rd.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th.  Every law that alters the legal rules of evidence, and receive less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender."

*Khalifa*, 382 Md. at 425 (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)).  The Court of Appeals has recognized that two elements must be present for a statute to violate the *Ex Post Facto* Clause of the United States Constitution and Article 17 of the Maryland Declaration of Rights: "'[I]t must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'" *Khalifa*, 382 Md. at 426 (quoting *Frost v. State*, 336 Md. 125, 136 (1994)).

Appellant fails to demonstrate in any way that P.S.A. § 5-205 is retrospective in his case.  The statute was amended in 2013 to include the restriction prohibiting individuals who had previously been convicted of a disqualifying crime from possessing a shotgun.  *See* P.S.A. § 5-205(b).  Appellant was charged for violating this statute for his conduct that occurred in 2014.  Accordingly, the statute is not retrospective in that appellant is not being punished for conduct that occurred prior to the enactment of the statute.

Appellant argues that he is being given additional punishment for his prior conviction, but P.S.A. § 5-205 is not an addition to his prior conviction; rather, it is punishment for a new criminal act.[7]

---

[7] This case is distinguishable, then, from *Doe v. Department of Public Safety & Correctional Services*, 430 Md. 535 (2013).  In *Doe*, the Court of Appeals held that requiring a convicted sex offender to apply to the sex offender registry violated the *Ex Post Facto* Clause where the conduct leading to the conviction occurred in 1984, and the

### III. The *Voir Dire* Questions

Prior to trial, appellant requested the circuit court to propound the following questions during *voir dire* of the potential jurors:

> 9. Does any member of the panel hold strong feelings regarding the possession of firearms?
>
> * * *
>
> 12. In our legal system, a criminal defendant is presumed innocent unless the State proves beyond a reasonable doubt that he or she is guilty. Does any prospective juror have any objection to or reservation about these principles or believe that the fact that a person has been charged is evidence that the person is guilty?

The court declined to give Question 9, feeling it was not an "appropriate" question, and refused to ask Question 12 "because it's really a jury instruction that I will cover with them at the appropriate time."

On appeal, appellant contended that the circuit court committed error in refusing to ask these questions. Appellant argued that a court must ask the potential jurors if they have any strong feelings about a charged crime when the defense so requests. Question 9, appellant contended, was such a question and would have permitted examination of whether potential jurors harbored any bias relative to firearms. Furthermore, appellant argued that Question 12 was aimed at exposing jurors who would not or could not

---

sex offender registry was created in 1995. *Id.* at 552-53. No new criminal conduct had occurred. Doe was being given additional punishment decades after his original conviction. *Id.* at 553. Appellant's conviction, on the other hand, does not violate the *Ex Post Facto* Clause of the United States Constitution or Article 17 of the Maryland Declaration of Rights because he is not being given additional punishment for his original crime but for a new crime.

13

maintain the presumption of innocence, which is a form of bias. Appellant, however, appeared to concede that questions like Question 12 are disfavored in Maryland because he cited several out-of-state cases in support.

Indeed, the State argued that the circuit court did not abuse its discretion in refusing to ask Question 12 because it addressed an area of law that is better left to jury instructions. The State noted that several decisions of this Court and the Court of Appeals have rejected similar *voir dire* questions. As to Question 9, the State contended that it is "virtually identical" to a question rejected in *Curtin v. State*, 393 Md. 593 (2006). Moreover, the State argues that the court addressed the concerns raised by Question 9 in other *voir dire* questions, including a final "catch-all" question.

The Court of Appeals has remarked: "'*Voir dire*, the process by which prospective jurors are examined to determine whether cause for disqualification exists, is the mechanism whereby the right to a fair and impartial jury . . . is given substance.'" *Moore v. State*, 412 Md. 635, 644 (2010) (quoting *Dingle v. State*, 361 Md. 1, 9 (2000)) (internal citations omitted). "In the absence of a statute or rule prescribing the questions to be asked of venirepersons during the examination, 'the subject is left largely to the sound discretion of the court in each particular case.'" *Id.* (quoting *Corens v. State*, 185 Md. 561, 564 (1946)). The Court of Appeals noted that questions asked of the *venire* panel should "'discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.'" *Id.* at 645 (quoting *Corens*, 185 Md. at 564). The questioning court should tailor the questions to the case, with "the

14

ultimate goal, of course, being to obtain jurors who will be 'impartial and unbiased.'" *Id.* (quoting *Dingle*, 361 Md. at 9).

A court abuses its discretion where the ruling under consideration is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Consol. Waste Indus., Inc. v. Standard Equip. Co.*, 421 Md. 210, 219 (2011) (quoting *King v. State*, 407 Md. 682, 711 (2009)). Stated another way, a court abuses its discretion "'where no reasonable person would take the view adopted by the [trial] court[] . . . or when the court acts without reference to any guiding principles.'" *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 418 (2007) (quoting *Wilson v. John Crane, Inc.*, 385 Md. 185, 198 (2005)). "'An abuse of discretion may also be found where the ruling under consideration is clearly against the logic and effect of facts and inferences before the court[] . . . or when the ruling is violative of fact and logic.'" *Id.* (quoting *Wilson*, 385 Md. at 198).

We perceive no abuse of discretion as to the circuit court's refusal to propound Question 12. Numerous appellate decisions of this Court and the Court of Appeals have held that propounding *voir dire* questions concerning rules of law covered by jury instructions is inappropriate. *See, e.g., Stewart v. State*, 399 Md. 146, 162-63 (2007) (noting that *voir dire* questions concerning jury instructions are "disfavored" "and a court does not abuse its discretion in refusing to ask them"); *State v. Logan*, 394 Md. 378, 398-99 (2006); *Marquardt v. State*, 164 Md. App. 95, 144 (2005) ("We begin by stating that this Court has not, nor could it, retreat from *Twining* [*v. State*, 234 Md. 97 (1964)]. We have consistently held that *voir dire* need not include matters that will be dealt with in the

15

jury instructions."); *Baker v. State*, 157 Md. App. 600, 616 (2004) ("'The rules of law stated in the proposed questions were fully and fairly covered in subsequent instructions to the jury. It is generally recognized that it is inappropriate to instruct on the law at this stage of the case [*voir dire*], or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law.'" (Quoting *Twining*, 234 Md. at 100)).

As to Question 9, the Court of Appeals has stated "that, on request, a trial court **must** ask during *voir dire* whether any prospective juror has 'strong feelings about' the crime with which the defendant is charged." *Pearson v. State*, 437 Md. 350, 360 (2014) (emphasis added) (quoting *State v. Shim*, 418 Md. 37, 54 (2011), *abrogated by Pearson*, 437 Md. at 363-64).[8]

Appellant clearly requested the circuit court to ask Question 9, which asked the potential jurors whether any juror held strong feelings regarding the possession of firearms. The State contended that Question 9 did not ask about the charged crime because appellant was charged with possession of a shotgun by a prohibited person. This appeared to be a semantic distinction that missed the point of the Court's holdings in *Shim* and *Pearson*.

In *Curtin*, *supra*, the Court noted that certain crimes – narcotics crimes and child molestation – "in and of themselves could evoke strong feelings that could unduly bias a

---

[8] In *Shim*, the Court held that the "strong feelings" *voir dire* question was required when requested, but the question in that case included language such that it shifted the burden of determining impartiality and bias to the potential jurors, not the court. 418 Md. at 54. *Pearson* maintained that "strong feelings" questions were required when requested, but did away with the burden-shifting language. 437 Md. at 363-64.

16

venireman." 393 Md. at 610. As to narcotics crimes, the Court recognized that there was an ongoing national debate regarding laws controlling marijuana and other drugs. *See State v. Thomas*, 369 Md. 202, 211-12 (2002), *abrogated on other grounds by Pearson*, 437 Md. at 363-64.[9] Indeed, this Court observed:

> "Laws regulating and prohibiting the use of controlled dangerous substances harbor an unusual position within our criminal code, such that jurors may be biased because of strong emotions relating to the dangers of narcotics and their negative effects upon our cities and neighborhoods, or, on the contrary, biases may exist because of passionate positions that advocate the decriminalization of narcotics."

*Id.* at 213 (quoting *Thomas v. State*, 139 Md. App. 188, 207 (2001), *aff'd*, 369 Md. 202 (2002)). The Court of Appeals also recognized that people may have strong emotions regarding child molestation, noting national and state efforts to address these types of crimes. *See Curtin*, 393 Md. at 609. "'[O]bserving that most citizens have a bias against proscribed criminal conduct is not extraordinary. Yet, a bias that is so strong against a particular criminal act that it distorts a juror's ability to render a fair and impartial verdict must be uncovered.'" *Singfield v. State*, 172 Md. App. 168, 173 (2006) (quoting *Thomas*, 139 Md. App. at 203).

In a concurring opinion in *Curtin*, Judge Wilner stated: "It is obviously not reasonable to presume that those [narcotics and child molestation] are the only kinds of crimes about which public emotion may run high. Surely, there are others." 393 Md. at

---

[9] Again, the *Pearson* Court reaffirmed the necessity of asking the "strong feelings" *voir dire* question when requested, but *Thomas*, like *Shim*, had burden-shifting language. 437 Md. at 363-64.

614 (Wilner, J., concurring) (emphasis omitted).  The Court then recognized these other crimes in *Shim*: "[W]e recognize today that the potential for bias exists in most crimes, and thus we will require *voir dire* questions which are targeted at uncovering these biases."  418 Md. at 54.

Regarding potential jurors' emotions and firearms, in *Uzzle v. State*, 152 Md. App. 548, 552-63 (2003), this Court determined that a trial court did not abuse its discretion in refusing to ask a series of *voir dire* questions as to those emotions.  That case, however, concerned multiple questions posed by Uzzle's counsel that did not focus on the charged crime of use of a handgun in the commission of a crime of violence.  *Id.* at 551, 553.  For example, Uzzle's counsel requested the court to ask not only whether any juror had any strong feelings about the possession of firearms (which, itself, was not focused on the charged crime), but also whether jurors believed it was a good idea to own a firearm for self-defense, whether any juror feared guns, and whether potential jurors were for or against gun control.  *Id.* at 553.  *Uzzle*, therefore, did not present a focused question as to "strong feelings" regarded a charged offense and was also decided prior to *Shim*.

This Court has previously recognized that the use of firearms in a murder may evoke strong feelings of potential jurors.  In *Singfield*, we held that the trial court erred in refusing to ask the *venire* if the nature of the case would make it difficult or impossible for potential jurors to render a verdict.  172 Md. App. at 170.  Singfield was charged with murdering his victim with a handgun, and his defense at trial was self-defense.  *Id.* at 169, 180.  We held: "[T]he jurors might also have had to determine whether [Singfield] used the handgun in a reasonable or justifiable way, [and this] might have evoked strong

18

feelings or biases concerning handguns." *Id.* at 180. We concluded that Singfield's proposed question "was aimed . . . directly at biases related to [Singfield]'s alleged criminal act and was reasonably likely to identify jurors with such strong feelings toward the use of handguns to commit murder that it would hinder their ability to render a fair and impartial verdict." *Id.* at 180-81.

Building on *Singfield*, *Shim*, and *Pearson*, we are persuaded that possession of firearms is one of those offenses that may "in and of themselves" evoke strong feelings that could hinder a potential juror's ability to render a fair and impartial verdict. Recognizing that people can hold strong feelings as to firearms, one Maryland trial judge remarked: "Some people believe that everybody ought to be able to carry a handgun and defend themselves. Other people believe that no one should have handguns." *Sanders v. State*, 194 Md. App. 162, 168 (2010), *vacated on other grounds by*, 418 Md. 368 (2011). Indeed, the intermediate Court of Appeals of Hawaii observed in 1982 that "[p]roposals for the licensing and registration of firearms have been the subject of national and local debate, and reported in the news media, for at least two decades." *State v. Emmsley*, 652 P.2d 1148, 1153 (Haw. Ct. App. 1982). That debate has only continued in the wake of several well-publicized mass shootings, the media's coverage of gun violence, and governmental efforts to address firearms.

We note that at least two federal courts and several of our sister state courts have also recognized that potential jurors may have strong feelings as to firearms. *See United States v. Tomlinson*, 111 F. Supp. 3d 856, 863-71 (W.D. Tenn. 2015) (discussing several potential jurors who had expressed strong feelings as to possession of firearms); *United*

19

*States v. Gibbs*, 125 F.Supp. 2d 700, 707 (E.D. Pa. 2000) (noting potential for strong feelings against firearms of a juror who had lost a limb to firearms and whose son had been killed in a drive-by shooting), *aff'd*, 77 F. App'x 107 (3d Cir. 2003) ; *People v. Abbott*, 690 P.2d 1263, 1268 (Colo. 1984) (recognizing that people may have strong feelings about firearms, but juror who expressed bias against guns was not biased against defendant); *Mungo v. United States*, 987 A.2d 1145, 1153 (D.C. 2010) (declining to find error in trial court's refusal to strike juror who had done radio commentaries on gun control because defendant had failed to bring this argument initially); *State v. Hill*, 556 S.W.2d 227, 228-29 (Mo. Ct. App. 1977) (finding juror who stated that he had strong feelings about the use of firearms in crimes such that he would tend to find the defendant guilty should have been disqualified); *State v. Brady*, 64 P.3d 1258, 1261-62 (Wash. Ct. App. 2003) ("[T]he case involved other issues that 'the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact,' such as firearms, and underage drinking and drug use." (quoting *State v. Frederiksen*, 700 P.2d 369, 372 (Wash. Ct. App. 1985))). *But see People v. Howard*, 588 N.E.2d 1044, 1056-57 (Ill. 1991) (finding no error in refusing to ask question as to jurors' feelings regarding firearms); *Commonwealth v. Szcuka*, 464 N.E.2d 38, 42-43 (Mass. 1984) (finding no error in refusal to ask potential jurors whether they would give more credit to testimony of police officer over other witness, as well as whether any potential jurors had strong feelings about firearms).

20

We note that jurors who respond in the affirmative to a strong feelings question are not automatically disqualified. *See Pearson*, 437 Md. at 364. Once a potential juror identifies strong emotions regarding a charged offense, the court and counsel should question that juror; then, "the trial court determines whether or not that prospective juror's strong feelings about the crime with which the defendant is charged constitute specific cause for disqualification." *Id.*

The State contended that Question 9 was adequately addressed by other questions, and the jurors were aware of appellant's charges as evidenced by the following which occurred during *voir dire*:

> Alright. So, as I mentioned a moment ago, I'm just gonna read a few sentences describing what this case is about. It's a criminal case. The Defendant, Mr. Norvel B. Thompson, is charged with the crimes of assault in the first degree, assault in the second degree, reckless endangerment, another charge of assault in the second degree and unlawful possession of a shotgun. It is alleged that the Defendant, on May 3, 2014, assaulted his wife, Karen Thompson [Somerville], by pointing a shotgun at her and threatening her. It's also alleged, on April 2, 2014, that he assaulted his wife by grabbing her around the neck . . . .

> \* \* \*

> Next question is have you or members of your immediate family or close personal friends ever been the victim of domestic violence? If so, please stand up and give us your number.

> \* \* \*

> Have you or any members of your immediate family ever been employed by, associated with, or performed volunteer work for any group or organization dealing with domestic violence, firearms or the prevention of crimes? If so, please stand up and give us your number.

> \* \* \*

21

> Alright. This is my last question. It's kind of a catchall. Is there any reason whatsoever that I might not have touched on yet why any of you feel you can't sit in this case and render a fair and impartial verdict? If so, please stand up and give us your number.

The circuit court's short narrative of the charges against appellant does not suffice as a substitute for appellant's "strong feelings" question. Indeed, the narrative did not ask a question of the potential jurors. Furthermore, neither the question regarding domestic violence, nor the question as to association with or work for an organization, dealing with domestic violence or firearms suffices as an adequate substitute. These questions simply do not address what appellant's question would have, which is whether any potential juror had strong feelings about the possession of firearms. Finally, the "catchall" question is a poor substitute for Question 9, because it puts the burden on the potential jurors to assess their impartiality in the case, something which the Court of Appeals rejected in *Pearson*, 437 Md. at 363-64.[10]

We note, too, that the Court of Appeals has since distinguished the question propounded in *Curtin*, which the State contended is "virtually identical" to appellant's Question 9, and had stated that "*Curtin* should therefore be limited to its facts." *Shim*, 418 Md. at 53. In *Moore*, *supra*, the Court of Appeals remarked that Curtin had been charged with armed robbery, yet it was his accomplice who brandished the gun. 412 Md.

---

[10] We note that three jurors responded to the court's catchall question. One juror stated that he or she knew Somerville. The court had previously pointedly asked, however, whether any potential jurors knew Somerville prior to asking the catchall question. The court ceased *voir dire* prior to questioning the other two jurors who responded to the catchall question.

22

at 662-63. The Court also observed that there were other *voir dire* questions in *Curtin* that adequately addressed potential issues of bias regarding armed robbery. *Id.* at 663. The Court concluded, therefore, that jurors' feelings as to handguns was a collateral issue in *Curtin*. *Shim*, 418 Md. at 52.

In this case, appellant requested a "strong feelings" question about the possession of firearms, which was a crucial element of the charged crime. *Voir dire* questions should be directed at uncovering biases of the charged crimes. There is no requirement that *voir dire* questions be so precisely worded as to be incomprehensible to potential jurors or unhelpful to trial courts; that is, a "strong feelings" question need not ask about jurors' feelings as to first-degree rape involving kidnapping, second-degree burglary where the burglar intended to commit arson, or assault of the attempted battery variety. Rather, the questions should be helpful to uncovering biases and be understandable by jurors. Accordingly, "strong feelings" questions more generally about rape, burglary, or assault would therefore be appropriate when requested, if those crimes have been charged. Hence, appellant's requested question went directly to one of the charged offenses – possession of a shotgun. The question was clearly appropriate, and the circuit court abused its discretion in failing to propound it. *See also Moore*, 412 Md. at 668 (noting that error in *voir dire* cannot be considered harmless). We, accordingly, vacate appellant's convictions and remand for a new trial.

## IV. Sufficiency of the Evidence

"In cases where this Court reverses a conviction, and a criminal defendant raises the sufficiency of the evidence on appeal, we must address that issue, because a retrial

23

may not occur if the evidence was insufficient to sustain the conviction in the first place." *Benton v. State*, 224 Md. App. 612, 629 (2015) (citing *Ware v. State*, 360 Md. 650, 708-09 (2000)). Because appellant raises the sufficiency of the evidence on appeal, we will address his arguments.

In reviewing the sufficiency of the evidence, "[w]e must determine 'whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Handy v. State*, 175 Md. App. 538, 561 (2007) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not retry the case. *Id.* at 562. Furthermore, "[w]e defer to the fact finder's 'opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence[.]'" *Neal v. State*, 191 Md. App. 297, 314 (2010) (quoting *Sparkman v. State*, 184 Md. App. 716, 740 (2009)).

### A. Second-Degree Assault

Before considering whether the evidence was sufficient to sustain appellant's conviction for second-degree assault, we first address the State's contention that this issue is not preserved. Maryland Rule 4-324(a) permits defendants to move for a judgment of acquittal at the close of the prosecution's case-in-chief and, in a jury trial, at the conclusion of the presentation of the evidence, and "[t]he defendant **shall** state with particularity all reasons why the motion should be granted." (Emphasis added). Indeed, if a defendant fails to present a particularized argument as to an offense, ordinarily it is not preserved for our review. *See Poole v. State*, 207 Md. App. 614, 633 (2012).

24

In this case, appellant moved for a judgment of acquittal at the appropriate times and made particularized arguments as to certain offenses. Appellant, however, failed to present any particularized argument as to second-degree assault. Accordingly, appellant's argument as to the sufficiency of the evidence sustaining the conviction for second-degree assault would ordinarily not be preserved. As we have vacated appellant's convictions, however, and retrial may not occur if there was insufficient evidence, we will address this issue. *See Robinson v. State*, 410 Md. 91, 118-19 (2009) (noting that appellate court may address unpreserved issue to "'provide guidance when there is likely to be a new trial'" (quoting *Conyers v. State*, 354 Md. 132, 150-51 (1999))).

Second-degree assault is prohibited by Md. Code (2002, 2012 Repl. Vol.), Criminal Law Article ("C.L.") § 3-203. The Court of Appeals has noted that there are three "types" of second-degree assault: "'1) intent to frighten; 2) attempted battery; and 3) battery.'" *Jones v. State*, 440 Md. 450, 455 (2014) (quoting *Snyder v. State*, 210 Md. App. 370, 382 (2013)). In this case, the State argued that appellant intended to frighten Somerville. "A defendant commits second-degree assault of the intent-to-frighten type where: (1) 'the defendant commit[s] an act with the intent to place [a victim] in fear of immediate physical harm;' (2) 'the defendant ha[s] the apparent ability, at [the] time, to bring about the physical harm;' and (3) '[t]he victim [is] aware of the impending' physical harm." *Id.* (quoting *Snyder*, 210 Md. App. at 382).

Appellant contended that the State failed to demonstrate he had the intent or ability to cause harm to Somerville because the State did not establish that the shotgun was loaded or operable when appellant pointed it at Somerville. Assuming *arguendo* that

25

the State failed to demonstrate that the shotgun was loaded and operable, there would still be sufficient evidence to sustain appellant's conviction. "For an assault of the intentional frightening variety . . . the assailant may be guilty even though he knows full well that he lacks any ability to follow through on his threat. That he knows the gun he points is unloaded or defective or is no gun at all is of no consequence." *Lamb v. State*, 93 Md. App. 422, 443 (1992) (citing *Dixon v. State*, 302 Md. 447, 463-64 (1985)). "**All that is required in terms of perception is an apparent present ability from the viewpoint of the threatened victim**." *Id.* (emphasis added) (citing *Hall v. State*, 69 Md. App. 37, 45 (1986)). Whether the State proved, therefore, that the shotgun was loaded or operable is inconsequential to the sufficiency of the evidence supporting the conviction for second-degree assault. Somerville's perception of the threat is the relevant consideration.

In this case, we conclude that a rational trier of fact could find sufficient evidence to convict appellant of second-degree assault. Somerville testified that appellant pointed a double-barrel shotgun at her face and said "I'm gonna blow your mf'ing brains out." Somerville stated that appellant stepped closer to her, and she heard the gun make a noise such that she thought appellant would fire. Additionally, she testified that she pleaded with appellant and prayed to be "ready" for death. Clearly, Somerville believed that appellant had the intent and ability to bring about the harm, namely her death, which is sufficient to support appellant's conviction.

### B. Reckless Endangerment

C.L. § 3-204(a)(1) provides: "A person may not recklessly: engage in conduct that creates a substantial risk of death or serious physical injury to another." The Court of

26

Appeals has noted: "'[T]he elements of a *prima facie* case of reckless endangerment are: 1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly.'" *Holbrook v. State*, 364 Md. 354, 366-67 (2001) (quoting *Jones v. State*, 357 Md. 408, 427 (2000)). Notably, "'[g]uilt under the statute does not depend upon whether the accused intended that his reckless conduct create a substantial risk of death or serious injury to another. The test is whether the appellant's misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe[.]'" *Id.* at 367 (quoting *Minor v. State*, 326 Md. 436, 443 (1992)).

Appellant contended that the evidence was insufficient to support his conviction for reckless endangerment because the State failed to establish that the shotgun was loaded. Appellant attempted to distinguish this case from *Minor*, *supra*, and *Wieland v. State*, 101 Md. App. 1 (1994). In *Minor*, the Court of Appeals sustained a conviction for reckless endangerment where Minor, intoxicated on alcohol and drugs, handed a loaded shotgun, with the safety off, to his brother and dared him to put the gun against his head and pull the trigger. 326 Md. at 443. In *Wieland*, this Court sustained a conviction for reckless endangerment where Wieland fired a gun at an individual – who turned out to be his brother – while drunk. 101 Md. App. at 28. We said that "brandishing a loaded and cocked weapon in the direction of another person, particularly when in shaky control of one's motor skills" was sufficient to sustain a conviction for reckless endangerment. *Id.*

27

To sustain a conviction for reckless endangerment in the case of a firearm, it is necessary to establish that it was operable. *See Moulden v. State*, 212 Md. App. 331, 358 (2013) ("These cases hold that the risk of death or injury created in recklessly handling a loaded, operable firearm is that the weapon may discharge."). Circumstantial evidence of operability, however, is sufficient. *See Mangum v. State*, 342 Md. 392, 400-01 (1996).

In this case, a rational trier of fact could have concluded that the double-barrel shotgun appellant aimed at Somerville was loaded and operable, which supports appellant's conviction for reckless endangerment. Again, Somerville testified that when appellant advanced toward her, she heard a noise such that she thought the gun was ready to fire. Somerville had some familiarity with shotguns, as she owned one. *See id.* at 401 (noting that familiarity with firearms could lead to conclusion that gun was operable). Moreover, there was testimony from which the jury could have concluded that appellant was familiar with firearms in that Smith testified she had observed, on a prior occasion, appellant firing shotguns at her mother's house. *See id.* Furthermore, Somerville stated that after appellant held the shotgun on her, she later found shotgun shells in his shaving kit. *See id.* (noting that possession of ammunition is circumstantial evidence of operability of gun).

Accordingly, taking the evidence in the light most favorable to the State, we conclude that there was sufficient evidence from which a rational trier of fact could have inferred that the shotgun was loaded and operable. A rational trier of fact, therefore, had sufficient evidence to convict appellant for reckless endangerment based on appellant's act of pointing a loaded, operable shotgun at Somerville's head.

28

## C. Possession of a Shotgun

P.S.A. § 5-205(b) prohibits certain individuals from possessing rifles or shotguns. Pertinent to this case, a person may not possess a shotgun if he or she "has been convicted of a disqualifying crime as defined in [P.S.A.] § 5-101[;]" or "has been convicted of a violation classified as a crime under common law and received a term of imprisonment of more than 2 years." P.S.A. § 5-205(b)(1)-(2). In this case, the parties stipulated that appellant was prohibited from possessing a shotgun due to a disqualifying crime.[11] Accordingly, then, in order to produce sufficient evidence to sustain appellant's conviction for possession of a shotgun, the State needed to demonstrate that appellant possessed a shotgun.

Appellant contended that there was insufficient evidence to support a conviction for possession of a shotgun because the State failed to demonstrate: 1) that Somerville's gun was a shotgun; 2) that Somerville's gun was operable; or 3) that the double-barrel shotgun appellant aimed at Somerville was operable. The State argued that operability is not a requirement of the statute.

A shotgun is defined as a weapon that is "(1) designed or redesigned, made or remade, and intended to be fired from the shoulder; and (2) designed or redesigned and

---

[11] There is some discrepancy as to which statute appellant was convicted under. The docket entries reflect that appellant was convicted pursuant to P.S.A. § 5-205. The State, however, contends that appellant was convicted pursuant to P.S.A. § 5-206. The statutes are different in that P.S.A. § 5-206 lists fewer enumerated offenses that prohibit possession of a shotgun and is also a felony, whereas P.S.A. § 5-205 is a misdemeanor. *Compare* P.S.A. § 5-205 *with* P.S.A. § 5-206. We will defer to the docket entries and also note that the court imposed a sentence of three years for possession of a shotgun, which is the maximum penalty permitted under P.S.A. § 5-205.

made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore one or more projectiles for each pull of the trigger." C.L. § 4-201(h). Taking the evidence in the light most favorable to the State, we conclude that a rational jury could have found that Somerville's single-barrel 12 gauge shotgun was a shotgun as defined by the statute, based on the testimony of Somerville and Smith.

Determining whether P.S.A. § 5-205 requires evidence of the shotgun's operability is a question of statutory construction. As such, we must "'ascertain and effectuate the intent of the Legislature.'" *Walzer v. Osborne*, 395 Md. 563, 571 (2006) (quoting *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006)). The Court of Appeals has explained: "'[T]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning.'" *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 182 (2006) (quoting *State Dep't of Assessments & Taxation v. Md.-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13 (1997)). If the statute is clear and unambiguous, then we will simply apply the statute as it is written. *Smack v. Dep't of Health & Mental Hygiene*, 378 Md. 298, 304-05 (2003). If the statute is ambiguous, "we look for legislative intent in other indicia, including the history of the legislation or other sources extraneous to the statute itself, as well 'as the structure of the statute, how it relates to other laws . . . its general purpose, and the relative rationality and legal effect of various competing constructions.'" *Id.* at 305 (quoting *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 220 (2003)) (internal citations omitted).

30

The State contends that P.S.A. § 5-205 is similar to P.S.A. § 5-133, which prohibits certain individuals from possessing firearms. Notably, like P.S.A. § 5-205, P.S.A. § 5-133 prohibits individuals from possessing a firearm if they have been convicted of a disqualifying crime. P.S.A. § 5-133(b)(1). The decision of the Court of Appeals in *Moore v. State*, 424 Md. 118 (2011), interpreting P.S.A. § 5-133, informs our consideration of P.S.A. § 5-205 in this case.

In *Moore*, 424 Md. at 122, Moore entered into a not guilty agreed statement of facts and was convicted of possession of a regulated firearm pursuant to P.S.A. § 5-133(c).[12] On appeal, Moore argued that there was no evidence that the firearm was operable, which is a required element of P.S.A. § 5-133. *Id*. The Court disagreed and determined that operability was not a necessary element of P.S.A. § 5-133. *Id*. at 122-23.

The Court began its analysis by looking to the definition of firearm in P.S.A. § 5-101(h): "Firearm means: (i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or (ii) the frame or receiver of such a weapon." The Court noted that this section did not include a requirement for operability. *Moore*, 424 Md. at 129. Looking to dictionary definitions, the Court recognized: "This part of the statute contemplates three distinct levels of functionality under which a firearm may fall: the first is 'a **weapon that expels** . . . a projectile by the action of an explosive.'" *Id*. at 130 (emphasis added) (quoting P.S.A. § 5-101(h)(1)).

---

[12] We note that P.S.A. § 5-133(c) differs from P.S.A. § 5-133(b) in that the former prohibits convicted felons from possessing firearms, whereas the latter is a more general prohibition.

"Secondly, the Section also provides that a firearm may be a **weapon that 'is designed** to expel . . . a projectile by the action of an explosive.'" *Id.* (emphasis added) (quoting P.S.A. § 5-101(h)(1)). Lastly, firearm also included a **weapon that could readily be converted** to expel a projectile, meaning that a firearm "thus includes a weapon that may be 'changed' or 'altered' 'in a prompt, timely manner,' from one that cannot 'expel a projectile by the action of an explosive' . . . to one that can 'expel a projectile by the action of an explosive.'" *Id.* at 131 (citations omitted). "This portion of the statute, thereby, also clearly contemplates that a firearm may be inoperable, although readily converted." *Id.* The Court also noted that P.S.A. § 5-101(h)(1)(ii) further supported the conclusion that operability was not required because the frame or receiver of a firearm, without other components, is inoperable, yet met the definition of a firearm. *Moore*, 424 Md. at 131-32.

Furthermore, the Court was persuaded that the history of the statute supported finding that operability was not a requirement of the possession statute. *Id.* at 132-36. Additionally, the Court recognized that P.S.A. § 5-133 was similar to a federal statute prohibiting certain individuals from possessing firearms, and federal courts had, also, determined that operability was not a requirement under the federal statute. *Moore*, 424 Md. at 134-37. The Court distinguished the definition of "handgun," as found in C.L. § 4-201, from "firearm" in P.S.A. § 5-101 and also noted that various decisions finding an operability requirement for conviction of use of a handgun or wearing/carrying a handgun used the definition of handgun as found in the Criminal Law Article, as opposed to

32

firearm as found in the P.S.A.[13]  *Moore*, 424 Md. at 138-40.  Ultimately, the Court

concluded, the "use" statutes targeted different behavior than the "possession" statutes.

*Id.*

Again, we note that a shotgun is defined as a weapon that is "(1) designed or

redesigned, made or remade, and intended to be fired from the shoulder; and (2) designed

or redesigned and made or remade to use the energy of the explosive in a fixed shotgun

shell to fire through a smooth bore one or more projectiles for each pull of the trigger."

C.L. § 4-201(h).

In *Moore*, the Court of Appeals noted that "designed" is defined as "'[t]o create or

contrive for a particular purpose or effect,' or 'to devise for a specific function or end.'"

424 Md. at 130 (internal citations omitted).  "In other words, a firearm may be a weapon

that is 'created,' 'contrived' or 'devised' for the 'specific function' or 'particular purpose'

to 'force out' or 'discharge' a projectile by the action of an explosive, although not

functional.  This portion **clearly includes inoperable, albeit designed to be operable,**

**firearms.**" *Id.* (emphasis added) (citing *Neal*, 191 Md. App. at 308).

We conclude, then, that P.S.A. § 5-205 does not require evidence of a shotgun's

operability because the weapon merely needs to be "designed or redesigned, made or

---

[13] C.L. § 4-201(c) defines handgun as "a pistol, revolver, or other firearm capable of being concealed on the person[,]" and includes short-barreled shotguns and rifles, but excludes shotguns, rifles, and antique firearms.

remade" to fire a shotgun shell from the shoulder. The weapon need not be currently operable.[14]

Taking the evidence in the light most favorable to the State, therefore, we conclude that a rational trier of fact could have found sufficient evidence to convict appellant of possession of a shotgun. The parties stipulated to appellant's disqualifying crime, and appellant does not contest possession of the shotgun. Furthermore, Somerville testified that the weapon appellant pointed at her was a double-barrel shotgun, and she later discovered shells in appellant's personal effects.[15]

## CONCLUSION

Because the circuit court abused its discretion in refusing to ask appellant's requested *voir dire* question as to the "strong feelings" potential jurors may have as to firearms, we vacate appellant's convictions and remand for a new trial. We find, however, no violation of appellant's statutory right to a speedy trial – the *Hicks* violation – nor is there a constitutional issue with appellant's conviction for possession of a shotgun. Appellant's remaining two issues are moot.

> **JUDGMENTS OF THE CIRCUIT COURT FOR KENT COUNTY VACATED, AND THE CASE IS**

---

[14] The definition of shotgun in Maryland law mirrors the definition in federal law. *See* 18 U.S.C. § 921(a)(5). Also, similarly, a shotgun need not be operable in order to sustain a conviction for possession of a shotgun by a prohibited individual under federal law. *See United States v. Yannott*, 42 F.3d 999, 1006-07 (6th Cir. 1994).

[15] Even if we agreed with appellant's interpretation of the statute, this would not aid him. As we noted, *supra*, in a discussion of operability of the shotgun for the reckless endangerment charge, appellant's possession of ammunition is circumstantial evidence that the shotgun was operable.

34

**REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 3/4 BY APPELLANT AND 1/4 BY KENT COUNTY.**