**Hogan v. State, No. 160 of the 2018 Term, Opinion by Moylan, J.**

UNLAWFUL POSSESSION OF A FIREARM – CONTENTIONS – FACTUAL BACKGROUND – A TOPSY-TURVY THRESHOLD – THE COMPETENCY HEARING – STATE V. HICKS – A. THE 180-DAY RULE – B. REQUEST FOR A COMPETENCY EVALUATION – C. THE CRITICAL HICKS POSTPONEMENT – D. "GOOD CAUSE" FOR THE POSTPONEMENT – E. WHEN DEFENDANT AND DEFENSE COUNSEL DISAGREE – F. THE 180-DAY RULE IN THIS CASE – SIXTH AMENDMENT SPEEDY TRIAL – A. DISTINCTION BETWEEN 180-DAY RULE AND CONSTITUTIONAL RIGHT – B. A MULTI-FACTORED ANALYSIS – C. LENGTH OF DELAY – D. REASON FOR THE DELAY – A GHOST CONTENTION: THE SECOND AMENDMENT'S RIGHT TO BEAR ARMS – SUPPOSE THE ALLEGEDLY "PLAIN ERROR" IS NOT PLAIN –THE MENS REA OF SIMPLE POSSESSION

Circuit Court for Carroll County
Case No. 06-K-16-047478

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 160

September Term, 2018

_____

STEVEN HOGAN

v.

STATE OF MARYLAND

_____

Wright,
Graeff,
Moylan, Charles E., Jr.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: March 29, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

It would be a non-sequitur to insist on a speedy trial if one were incompetent to stand trial at all, speedily or otherwise. On the other hand, should the incompetency lapse, the entitlement to a speedy trial would concomitantly revive, but on a new and inevitably altered calendar. Its latter-day calculation could not escape the shadow of the earlier incapacity. This appeal presents an interesting interplay between the thrust and counterthrust of speedy trial versus no trial at all.

The appellant, Steven Hogan, was convicted in the Circuit Court for Carroll County by a jury, presided over by Judge Thomas F. Stansfield, of the unlawful possession of a firearm and the unlawful possession of ammunition by a person disqualified from possessing either.

## Contentions

On this appeal, the appellant raises, in effect, six contentions. He claims

1. that at one point in the proceedings, Judge Fred S. Hecker, over the appellant's objection, erroneously ruled that he was incompetent to stand trial;

2. that the appellant was denied his right to a speedy trial pursuant to Maryland statutory law and Maryland caselaw per State v. Hicks;

3. that the appellant was denied his constitutional right to a speedy trial pursuant to the Sixth Amendment;

4. that Judge J. Barry Hughes erroneously denied the appellant's challenge to the constitutionality of Public Safety Article, Section 5–113;

5. that the State was permitted to make an improper rebuttal argument to the jury; and

6. that Judge Stansfield gave an improper instruction to the jury.

## Factual Background

As of the critical confrontation of July 14, 2016, between the appellant and members of the Westminster City Police Department, the appellant was a 66-year-old man who had spent most of his adult life in law enforcement. As he told the story at his trial, he spent two and a half years with the Anne Arundel County Police.

I was a cadet, and when I made patrol, then I quit and retired. Or I quit and went with the state because it paid more.

The State employment consisted of 23 years as a prison guard.

Q      And you were with the Department of Corrections as a prison guard, correct?

A      Yeah, at -- Institution.

Q      How long were you there?

A      Twenty-three years. I was the regional tactical commander for the Jessup region.

Q      And at one point you got hit in the head, correct, and had injuries to your head?

A      Yeah.

The State employment was followed by a job in Howard County "in charge of central booking."

Q      And did that cause your retirement eventually?

A      No. No, that didn't. I just got tired of that kind of work and went with Howard County and became in charge of central booking.

Q      And then you retired from Howard County?

A      Yes, I did. After 15 years.

2

On July 14, 2016, the appellant's conduct was unsettling to the police. From his home at 438 Spalding Court in Westminster, the appellant called 911 and asked the dispatcher to have the police respond to his home, but to do so "one at a time" because of his broken front door. He specifically asked the dispatcher to send "that Darby," presumably referring to Westminster Police Sergeant Radcliffe Darby. Sergeant Darby, however, was committed to another assignment and Sergeant Richard Lambert led the team that responded to the appellant's call.

While Sergeant Lambert was waiting for the appellant to respond to his knocks on his door, he looked for damage to the door but found none. When, after the third knock, the appellant answered the door, he appeared distraught and was holding what the sergeant believed was a silver cell phone in his right hand. The appellant's first response was to ask if Sergeant Lambert was the "real police" and then to ask, "Where the fuck is Darby?" The appellant revealed that the purpose of his 911 call was that he wanted his property back and that "all Darby gave him was this fucking Derringer." He was actually turning the object referred to in his hand when Sergeant Lambert realized that the appellant was holding a small gun and not a cell phone. Sergeant Lambert attempted to grab the gun from the appellant's hand, but the appellant said, "Hell no," retreated into the house, and shut the door. Sergeant Lambert called for backup, including the SWAT team and hostage negotiators.

The backup team shortly responded. Sergeant Darby heard of this ongoing encounter over the police radio and also responded to the scene. He had recognized the

3

address mentioned on the radio dispatch as the appellant's. He also knew that the appellant was disqualified from possessing a handgun because of a disqualifying criminal conviction in an assault case for which Sergeant Darby had arrested him.

After the backup team arrived, the appellant came out of the house on several occasions. Sergeant Darby, Officer Michael Beaumont, and Officer Martin Runk all testified that the appellant was "agitated," "hostile," and "argumentative." He was continuously "demanding evidence" that he wanted returned. Sergeant Darby tried to engage him in conversation and to convince him to come down off the front porch. When the sergeant got within 12 feet of him, he fired his taser and hit the appellant. The appellant, however, was able to pull out one of the probes and to run back inside the house.

He shortly reemerged and asked to speak with Sergeant Darby again. When Sergeant Darby convinced him to step off the front porch, Officer Beaumont was able to come from the side of the house and to fire his taser into the appellant's back. As the appellant fell backward, a small Derringer .38 revolver fell out of his pocket. The appellant was arrested. The Derringer was loaded with two rounds.

## A Topsy-Turvy Threshold

It is not normal for a party in a case to appeal from a ruling on which that party prevailed. The appellant, however, now does just that. On the day first scheduled for the trial of this case, defense counsel, explaining his reasons for grave concern, requested Judge J. Barry Hughes to order a psychiatric examination and then to hold a hearing to determine the competence of the appellant to stand trial. Judge Hughes, over the vociferous

4

protest of the appellant himself, granted the defense request. The appellant, whether he was aware of it or not, had the absolute constitutional right not to be tried if he was incompetent to stand trial. <u>Medina v. California</u>, 505 U.S. 437, 449, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992); <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975).

At a time when the appellant was alleged to be incompetent and when the subsequent hearing confirmed that the appellant was, indeed, incompetent, defense counsel was, of necessity, authorized to speak for the appellant. Defense counsel made the defense request, and the request was granted. At the subsequent competency hearing, the defense prevailed and the appellant was found to be and to have been incompetent. The appellant was thus protected from going to trial under the handicap of not being competent to stand trial. The appellant was thus protected from himself.

There are, to be sure, instances in the law where defendants challenge positions earlier taken by defense counsel. Most of those instances, however, occur in hearings pursuant to the Post-Conviction Procedure Act. In most of those instances, moreover, the defendants claim to have suffered inadequate assistance of counsel. The appellant has made no such claim in this case. In this case, of course, counsel's suggestion of incompetency was confirmed as having been correct. Defense counsel's judgment was thus fully vindicated. The appellant's first contention, challenging a procedure theoretically requested by him (through counsel) and for his unquestioned benefit, is almost nonchalant with no citation of authority for its unusual procedural posture. We will not quibble, however, and will entertain the contention as it is framed.

5

Even if the appellant were, _arguendo_, to prevail on this first contention, a very poignant question would then loom as to what conceivable prejudice the appellant has suffered. He now claims that he was competent to stand trial as early as January of 2017. He was ultimately determined to be competent and, thus competent, stood trial 11 months later. He was found guilty.

The only possible adverse impact would have been on his right to a speedy trial. In the multi-factored analysis of a speedy trial claim, both under Hicks and under the Sixth Amendment, a pertinent factor would be the reason for the extra period of delay to resolve the incompetency question. To mount such an argument, however, the appellant would have to attribute the reason for that extra delay to the State. He would have to take a delay requested by defense counsel and for the exclusive benefit of the defendant and, with unquestionable ill grace, blame it on the State. Ironically, almost hopelessly lost in the hurly-burly of the criminal trial postponement hearing of January 17, 2017, is the State's official position, from which it never wavered:

> [PROSECUTOR]: No questions, Your Honor. I just want the record to reflect that the State was ready to proceed today.

(Emphasis supplied). In all of the incompetency hullabaloo, the State was simply an innocent and unobtrusive spectator.

Thus, as we stand before this strange threshold, the appellant's primary contention about the competency hearing loses all independent or free-standing viability of its own and is reduced to a mere factor in the speedy trial analyses. The oddity, moreover, remains that the appellant is appealing from an aspect of the trial he himself, through

6

counsel, requested; that was granted for his exclusive benefit; and that ultimately turned out to be of significant benefit to him. It would have been outrageous to have tried and convicted an incompetent defendant. Of which, more infra!

## The Competency Hearing

The answer to the appellant's first contention is easy. It is the established law of the case that the finding of Judge Fred S. Hecker on May 11, 2017, that the appellant was incompetent to stand trial was erroneous is a moot question.

Following the May 11, 2017, hearing on competency and well before the appellant's criminal trial on December 6, 2017, the appellant filed an appeal with this Court raising precisely the same issue he now raises in this contention. His question in that earlier appeal of August 3, 2017, was "[w]hether the circuit court erred in ruling that [he] was incompetent to stand trial." Argument on that earlier single-issue appeal was heard on April 5, 2018, and this Court filed its unpublished opinion on April 27, 2018. Hogan v. State, No. 1078, September Term, 2017, filed on April 27, 2018. We are chagrined that, in the current case, the appellant made no mention of or remote allusion to that earlier appeal.

This Court there held that, because of the later December 5, 2017, ruling that the appellant was competent, the earlier appeal from an incompetency filing was moot. We held:

> In this case, Hogan appealed the circuit court's May 11, 2017 finding that he was incompetent to stand trial. When the circuit court found Hogan competent to stand trial on December 5, 2017, it ended the controversy that was the subject of this appeal, such that this Court can no longer fashion an appropriate remedy. Cottman v. State, 395 Md. 729, 744 (2006) (a case is

7

moot when "there is no longer any existing controversy between the parties" and the appellate court "can no longer fashion an effective remedy").

(Emphasis supplied).

The only impact that the competency evaluation and the respective findings of first incompetency and then competency could have had on the present appeal would be as a factor in the speedy trial analyses. In that earlier appeal, Judge Stuart Berger, writing for the Court, observed:

> At oral argument, Hogan's counsel contended that this appeal is not moot because the circuit court violated his right to a speedy trial by ruling that Hogan was incompetent, which prolonged his case beyond 180 days. Indeed, we have scoured the appellant's brief, and we find just one sentence alleging an infringement of his right to a speedy trial. Hogan has failed to provide a modicum of factual or legal support for his claim. See Van Meter v. State, 30 Md. App. 406, 408 (1976) ("We cannot be expected to delve through the record to unearth factual support favorable to appellant and then seek out law to sustain his position."). Further, we need not decide this issue at this time because there is no record for which we could decide this issue. The record is absent of any reference to a motion to dismiss filed in the circuit court and any indication whether the circuit court made a good cause finding to extend the case beyond 180 days.
>
> In our view, the far preferable course is to permit Hogan to raise the speedy trial issue in the appeal from his convictions, to the extent he has preserved that issue. Accordingly, to the extent Hogan asserts that his right to a speedy trial was violated because of an erroneous competency finding, if preserved, he can make that argument in the direct appeal of his convictions.

(Emphasis supplied).

The appellant does now raise speedy trial issues and, accordingly, we shall address them. The contention concerning the incompetency finding of May 11, 2017, however, is, as we have already held, dismissed as moot.

## State v. Hicks

### A. The 180-Day Rule

Maryland Code, Criminal Procedure Article, Sect. 6–103(a) provides:

(a) (1) The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:
(i) the appearance of counsel; or
(ii) the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.
(2) <u>The trial date may not be later than 180 days after the earlier of those events.</u>

(Emphasis supplied).

Maryland Rule of Procedure 4–271(a) implements that statute, providing in pertinent part:

**(a) Trial Date in Circuit Court**

(1) <u>The date for trial in the circuit court</u> shall be set within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213, and <u>shall be not later than 180 days after the earlier of those events.</u>

(Emphasis supplied).

It was in <u>State v. Hicks</u>, 285 Md. 310, 318, 403 A.2d 356, <u>on motion for reconsideration</u>, 285 Md. 334, 403 A.2d 368 (1979), that Chief Judge Robert C. Murphy said for the Court of Appeals that time limits for conducting a criminal trial such as those now spelled out in Criminal Procedure Article, Sect. 6–103(a) and Rule 4–271(a) are "mandatory and that dismissal of the criminal charges is the appropriate sanction where the State fails to bring the case to trial within the . . . period prescribed by the rule and

9

where 'extraordinary cause'[1] justifying a trial postponement has not been established."

What has been since 1979 the 180-Day Rule is also regularly known as the <u>Hicks</u> Rule.

## B. Request For A Competency Evaluation

In this case, counsel for the appellant first entered his appearance, along with a demand for a speedy trial, on August 11, 2016. Accordingly, the 180-day clock began to tick on that day and the <u>Hicks</u> deadline became February 7, 2017. The trial date was set for January 17, 2017, and all parties were in court ready for trial on that morning. It was at the appearance before Judge Hughes that morning that the issue of the appellant's suspected incompetence first arose. Defense counsel first raised the subject:

> THE COURT: Good morning, sir. All right. This matter was set for trial today. [Defense counsel].
>
> [DEFENSE COUNSEL]: Yes, Your Honor. After speaking with my client several times over the last couple of months, <u>I have serious concerns right now about his competency. On our last visit on Friday I was talking to him and had certain concerns the way he was responding to certain questions.</u> Your Honor, we met in chambers that afternoon.
>
> <u>Yesterday I went to see my client again in the Carroll County Detention Center. He advised me that he wanted to fire me after I told him about the competency.</u>
>
> <u>I spoke with him again this morning. He advised me he does not want to fire me,</u> so that is a pending issue. But <u>I do feel that competency is an issue, so Defense requests a postponement.</u>
>
> I know Mr. Hogan himself is going to be objecting to that request, but I do have in my possession a request for a competency evaluation.

(Emphasis supplied).

---

[1] The rules now require simply "good cause" and not "extraordinary cause."

The appellant strenuously objected to a competency examination.

> THE DEFENDANT: I object to the competency evaluation because I had one by Dr. Katz, I had one by Dr. Hightower that states I am competent. I had recently had one done by my attorney . . . that says I am competent. And this fact that he is talking about seeing me, he only saw me two times, and that is within the past four months.
>
> I have not seen him since then, and I told him I -- he agreed to go along with the trial, then suddenly he changed his mind.

(Emphasis supplied).

The appellant then broadened the protest as he launched into an unsolicited attack on the Assistant State's Attorney prosecuting the case. In a Captain Queeg-like episode of psychological unraveling,[2] he unwittingly demonstrated the likely value of a competency evaluation.

> And [the prosecutor] set me up with a lie saying that I was suicidal from listening to a phone call. And I have a witness here who I talked to who would tell you that she's lying.
>
> So, they put me on suicide watch for that, and the mental health woman disagrees. She agrees with me that that was not founded and untrue. And she did it deliberately to keep this paperworks [sic] from me, to keep attorneys' phone numbers from me, and they just now brought them up. They would never let me have them the whole time I was on this suicide watch, which I was taken off from yesterday. Or stepped down. You have to step down on it.
>
> This is all a set up. You have set me up. You took my money, and you said you --
>
> THE COURT: Sir. Mr. Hogan, speak to me, please. Is there anything else that you wanted to say?
>
> THE DEFENDANT: That's all. I object to this.

---

[2] Herman Wouk, The Caine Mutiny.

THE COURT: Okay.

THE DEFENDANT: And I object to [the prosecutor]. I'm going to file paperwork on that.

THE COURT: All right. You can all have a seat for just a moment.

(Pause.)

THE DEFENDANT: Your Honor, can I say one more thing?

THE COURT: All right. Go ahead.

THE DEFENDANT: She's been on my case now for three years. You know, for three years I've been in jail, and I'm 66 years old. I object to her being on this case because she's done a lot of crooked things, and she is -- I've got paperwork on it, and she's going to be sued for it.

THE COURT: All right. Thank you, sir. You can have a seat.

With each conspiratorial embellishment, the appellant displayed the very flight from reality he was seeking to deny. In the immortal words of Alice, it got "curiouser and curiouser."[3] Judge Hughes tried to explain to the appellant the purpose of the evaluation as he ordered that a competency examination be made.

THE COURT: All right, Mr. Hogan. The request by [defense counsel] for you to be evaluated is a duty that he has to the Court, should he see any behavior that he thinks warrants such an evaluation. The fact that you may have been evaluated and found to have been competent at some point in the past doesn't necessarily mean that you are competent today, because the purpose of this evaluation is to see if at this point in time when you go to trial, you are able to understand the nature of the proceedings against you.

THE DEFENDANT: But, Your Honor, I was evaluated yesterday.

_____

[3] Lewis Carroll, Alice's Adventures in Wonderland.

12

THE COURT: Listen to me. Listen to me, please. I listened to you. Now listen to me. Okay? <u>The purpose of the evaluation is to see if you understand the nature of the charges against [you] and can assist your attorney in your defense.</u> You may think there is no question on this. [Defense counsel] has represented many, many, many clients. He is an officer of the Court.

And while obviously he cannot tell us specifics in terms of your conversation, that is protected by attorney/client privilege, <u>he can tell us of his observations and the extent to which he is concerned because we don't try people who are not competent to be tried. That is a bedrock principle of the Court.</u>

So, <u>we have to deal with this issue first.</u> So, <u>I am going to order a competency evaluation.</u> You will have the ability to tell the evaluator what you want to on the issue of competency.

(Emphasis supplied).

## C. The Critical <u>Hicks</u> Postponement

It was the Assistant State's Attorney who alerted the court to the imminence of the

<u>Hicks</u> deadline.

[PROSECUTOR]: Your Honor, I would agree based on the information that I have, that a competency evaluation would be in order at this time. <u>We do have a Hicks date of February 7th, and I believe there would be good cause to waive that Hicks date at this time, because I don't believe a competency evaluation can be done in that period of time.</u>

(Emphasis supplied).

Judge Hughes agreed that the case would have to be postponed to a time beyond the

<u>Hicks</u> deadline.

<u>I do find, based on this situation</u> that the Court is confronted with, <u>that there is good cause to waive the application of the Hicks Rule</u> in this case. So, the Court will do that today. I will waive the operation of the <u>Hicks</u> Rule.

13

> I will direct that this matter be set back in approximately 90 days so that we can consider further proceedings in this case.

(Emphasis supplied).

## D. "Good Cause" For The Postponement

On this <u>State v. Hicks</u> contention, therefore, our focus is on the January 17, 2017, decision of Judge Hughes to order a psychiatric examination of the appellant and a subsequent hearing to determine whether the appellant was competent to stand trial. The postponement that was the inevitable consequence of that decision was the critical postponement that carried the case beyond the 180-day deadline. <u>State v. Brown</u>, 355 Md. 89, 108–09, 733 A.2d 1044 (1999). As Judge Eldridge wrote for the Court of Appeals in <u>State v. Frazier</u>, 298 Md. 422, 428, 470 A.2d 1269 (1984):

> The critical order by the administrative judge, for purposes of the dismissal sanction, is the order having the effect of extending the trial date beyond 180 days.

<u>See also Rosenbach v. State</u>, 314 Md. 473, 478, 551 A.2d 460 (1989).

On the <u>Hicks</u> issue, the only issue is that of whether Judge Hughes had "good cause" to grant defense counsel's request for a competence evaluation and, therefore, to postpone the trial date to one beyond the 180-day deadline of February 7. Judge Wright's opinion for this Court in <u>Thompson v. State</u>, 229 Md. App. 385, 145 A.3d 105 (2016), is absolutely controlling. In <u>Thompson</u> defense counsel moved, prior to trial, for a competency evaluation, which the trial court granted. 229 Md. App. at 396. In subsequently arguing for a dismissal based on a <u>Hicks</u> violation, Thompson argued that a competency evaluation is not a good cause for delaying a trial beyond a <u>Hicks</u> deadline.

14

> Appellant argues that a competency evaluation is not, as a matter of law, a good cause to delay a trial, and the court was not required to wait five weeks for the results of the examination and/or mandate that the evaluation be completed by a psychiatrist. Appellant concedes, however, that once he raised the issue of his own competency, the court was required to determine whether he was competent to stand trial.

229 Md. App. at 397 (emphasis supplied).

Judge Wright's answer to the contrary was sure.

> The Court of Appeals has held that "[o]nce the issue of a defendant's competency has been raised, the proceedings cannot continue until the trial judge determines that the defendant is competent to stand trial beyond a reasonable doubt." Accordingly, then, once appellant's counsel filed the motion for a competency evaluation, the case could not continue until the circuit court determined that appellant was competent to stand trial.

229 Md. App. at 399 (emphasis supplied; citations omitted).

The answer to the critical question admitted of no doubt.

> We agree with the State that complying with Crim. Pro. § 3–104 constitutes good cause to delay the trial beyond the Hicks time limit.

Id. (Emphasis supplied).

The Thompson opinion also established that although a trial judge might be able to answer the competency question without ordering an evaluation, it is clearly within the judge's discretion to order such an evaluation.

> Although appellant is correct that a determination of competency need not be based on a medical or psychiatric examination a judge may certainly feel that a medical or psychiatric evaluation is helpful to that determination.

Id. (Emphasis supplied; citation omitted).

A trial judge's decision to order such an evaluation is, moreover, one that will be reviewed by the abuse of discretion standard.

15

"'The determination as to what constitutes a <u>good cause</u>, warranting an extension of the trial date beyond the [180-day] limit, <u>is a discretionary one, which . . . carries a presumption of validity.</u>'"

229 Md. App. at 398 (emphasis supplied; citations omitted).

The Court of Appeals is solidly in line. In <u>State v. Cook</u>, 322 Md. 93, 585 A.2d 833 (1991), the Court held that an order for a mental examination of a defendant that carried a trial beyond the 180-day deadline did not constitute a <u>Hicks</u> violation. Judge Orth's opinion for the Court followed the earlier precedent of <u>Carey v. State</u>, 299 Md. 17, 472 A.2d 444 (1984), which Judge Orth summarized.

> In <u>Carey v. State</u>, 299 Md. 17, 472 A.2d 444 (1984), the administrative judge, within the 180-day period for trial, ordered that a mental examination be performed on the defendant. . . . . We held that <u>the administrative judge's order for a mental examination</u> of the defendant <u>constituted an order postponing the trial as required by the Hicks Rule.</u>

322 Md. at 101 (emphasis supplied).

## E. When Defendant And Defense Counsel Disagree

In order to override the 180-day trial deadline, it is not necessary that the request for a competency hearing come from the defendant personally. A <u>sua sponte</u> and discretionary decision in that regard by the trial judge, for instance, would constitute "good cause" even though neither the defendant nor defense counsel joined in the request. The appellant in this case, however, obsesses over the fact that he expressly objected to the competency hearing notwithstanding the fact that it was his defense counsel who requested the hearing. The caselaw, however, has regularly and expressly included defense counsel as one of the parties who may request a competency hearing without any regard to whether the client is

16

joining in the request. In <u>Johnson v. State</u>, 67 Md. App. 347, 358–59, 507 A.2d 1134, <u>cert. denied</u>, 307 Md. 260, 513 A.2d 314 (1986), this Court listed the eligible parties.

> [T]he trial court's duty to determine the competency of an accused to stand trial is triggered in one of three ways: (1) upon an allegation by the accused himself that he is incompetent; (2) <u>upon an allegation by defense counsel that the accused is incompetent</u>; or (3) upon the court's <u>sua sponte</u> decision that the accused appears to be incompetent.
>
> . . . .
>
> [A] judicial determination of the accused's competency to stand trial is mandatory in any of those three situations[.]

(Emphasis supplied; citation omitted). <u>See also Smith v. State</u>, 62 Md. App. 670, 677, 491 A.2d 587, <u>cert. denied</u>, 304 Md. 96, 497 A.2d 819 (1985).

<u>State v. Brown</u>, 355 Md. at 97, expressly referred to defense counsel as a distinct party.

> "A second circumstance where it is inappropriate to dismiss the criminal charges is where <u>the defendant, either individually or by his attorney</u>, seeks or expressly consents to a trial date in violation of Rule 746."

(Emphasis supplied; citation omitted). <u>See also Peaks v. State</u>, 419 Md. at 251 ("The duty of the trial court may be triggered upon motion of the accused <u>or defense counsel</u>, or upon <u>sua sponte</u> action of the court." (Emphasis supplied; citation omitted).).

<u>Hill v. State</u>, 35 Md. App. 98, 106, 369 A.2d 98 (1977), also recognized defense counsel as a separate and distinct party, eligible to request a competency hearing.

> [T]he presumption of competency to stand trial does not disappear merely because <u>the issue is raised by allegations of the accused or his counsel</u> . . . . Such an allegation mandates no more than that the court make 'a determination upon testimony and evidence' upon the issue whether an accused is competent to stand trial.

17

(Footnote omitted).

Shiflett v. State, 229 Md. App. 645, 682–83, 146 A.3d 504 (2016), recognized defense counsel as an eligible party without recognizing the defendant himself.

> If the defendant's competency is in doubt, whether the question is raised by counsel or the court decides to pursue the matter sua sponte, the court must conduct a hearing to determine "whether [the accused] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational as well as factual understanding of the proceedings against him."

(Emphasis supplied; citation omitted).

Thanos v. State, 330 Md. 77, 85, 622 A.2d 727 (1993), speaks to the same effect.

> As the statute makes plain, a trial court's duty to determine the competency of the accused is triggered in one of three ways: (1) upon motion of the accused; (2) upon motion of the defense counsel; or (3) upon a sua sponte determination by the court that the defendant may not be competent to stand trial.

(Emphasis supplied; citation omitted). See also Roberts v. State, 361 Md. 346, 364–65, 761 A.2d 885 (2000); Johnson v. State, 67 Md. App. 347, 358–59, 507 A.2d 1134 (1986).

In dealing with the subject of a defendant's trial incompetency, the distinction between defendant and defense counsel is particularly appropriate to examine. In a situation where a defendant is deemed to be ineligible to speak for himself, it is necessary to have counsel who can speak for him. In this case, moreover, the ultimate judgment of the court vindicated the wisdom of defense counsel to seek a competency hearing, notwithstanding the protests of the appellant himself. Lewis v. State, 79 Md. App 1, 555 A.2d 509, cert. denied, 316 Md. 549, 560 A.2d 1118 (1989), makes it clear that a competency hearing is for the benefit of a defendant whether the defendant wants such a

18

hearing or not. Accordingly, any delay occasioned by such a hearing is charged to the hearing's ultimate beneficiary, to wit, the defendant himself.

> We also observe that <u>delays in the proceedings caused by examinations to determine defendant's competence are charged against the defendant</u> because <u>such evaluations are solely for his benefit.</u> Even if time limits for such reports are violated, dismissal of the case is not the appropriate sanction.

79 Md. App. at 17 (emphasis supplied; citations omitted). <u>See also Dyson v. State</u>, 122 Md. App. 413, 419, 712 A.2d 573 ("<u>The actions of counsel</u> in this regard, moreover, <u>are binding on a defendant</u> and are not sapped of vitality simply because the defendant has not directly or personally participated in the decision-making process." (Emphasis supplied).), <u>cert. denied</u>, 351 Md. 287, 718 A.2d 235 (1998), <u>rev'd on other grounds, Maryland v. Dyson</u>, 527 U.S. 465, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999); <u>State v. Lattisaw</u>, 48 Md. App. 20, 28–29, 425 A.2d 1051, <u>cert. denied</u>, 290 Md. 717 (1981); <u>Woodlock v. State</u>, 99 Md. App. 728, 738, 639 A.2d 188 (1994); <u>Jules v. State</u>, 171 Md. App. 458, 475, 910 A.2d 553 (2006), <u>cert. denied</u>, 396 Md. 525, 914 A.2d 769 (2007).

For purposes of speedy trial analysis (especially when assessing the reason for a delay), the fact that the defendant and defense counsel are in tactical disagreement with each other does not thereby transform defense counsel into "the State" or even into "the court." Defense counsel will not be treated as the opposing party. Nor need we entertain protestations about the absence of a personal waiver of a right to a speedy trial by one who was at the time certifiably incompetent to waive that or any other right.[4] In such a state of

---

[4] The notion of waiver, moreover, would be precluded because the 180-Day Rule is not a personal right of a defendant. <u>See Marks v. State</u>, 84 Md. App. 269, 277, 578 A.2d

impairment, a client enjoys the services of counsel to act on his behalf and the two will necessarily be treated as an indivisible entity.[5]

## F. The 180-Day Rule In This Case

In this case, the 180-day clock of State v. Hicks began to tick on August 11, 2016. On the scheduled trial date of January 17, 2017, the day on which Judge Hughes granted defense counsel's request for a competency hearing, the Hicks calendar was at Day 159. There were still 21 days to go before the Hicks deadline of February 7, 2017. As we have already held, "good cause" existed for ordering the competency evaluation, the order that necessarily carried the Hicks trial date beyond the 180-day deadline. All parties agree that as of January 11, 2017, there had been no even arguable Hicks violation.

Beyond that date, a monolithic, overriding, and absolutely neutral circumstance took complete control of the entire trial scheduling process. Neither the court nor the defense nor the State could countermand the imperative that the appellant could not be tried unless and until the appellant was judicially determined to be competent to stand trial. Neutral

---

828 (1990) ("The purpose of the 180 day rule is to protect the societal interest in the prompt trial of criminal cases; the benefits that the rule confers upon defendants are incidental." (Citation omitted).).

[5] On an earlier occasion, the appellant was convicted of burglary and assault. On the first scheduled day for trial in that case, it was the appellant himself who requested a postponement so that he could be given a neurological evaluation. The appellant's request was granted and a trial delay of almost two years followed. In that case, as in this, the appellant claimed violation of both State v. Hicks and the Sixth Amendment. On appeal, this Court affirmed the convictions. Hogan v. State, No. 895, September Term, 2016, filed on September 14, 2017, cert. denied, 457 Md. 146, 177 A.3d 76 (2018).

circumstances, beyond the control of any (or, indeed, all) of the parties, were in total control of the scheduling process.

The full range of psychiatric evaluations and studies of the appellant were duly conducted. Judge Hughes was informed on April 5, 2017, that the competency evaluation had been made. Accordingly, a full competency hearing was scheduled for May 11, 2017, and was conducted on that day before Judge Hecker. The determination of that hearing, which we have heretofore affirmed supra, was that the appellant was, indeed, incompetent to stand trial. That determination ipso facto negates any claims of the appellant that his trial could have been somehow rescheduled to a time before May 11, 2017. Such a rescheduling would have been during a period of incompetency. Looking forward from May 11, 2017, it was equally obvious that no trial date could be scheduled for the appellant unless and until he was judicially determined to be competent to stand trial, whether or not such a change in the appellant's circumstances would take weeks or months or years.

During the summer of 2017, Dr. Hightower reached the conclusion, apparently because the appellant was on his prescribed medications, that the appellant was then competent to stand trial. Her report to that effect was received by the court on September 25, 2017. A competency hearing was promptly scheduled for October 3, 2017. That hearing date, however, was postponed at the request of defense counsel because of a scheduling conflict involving counsel. On October 10, 2017, there was another postponement of the competency hearing, apparently because of a scheduling conflict involving the State. The rescheduled hearing on the appellant's competency status was set for December 5, 2017.

21

At the rescheduled competency hearing of December 5, 2017, Judge Hughes found him to be competent to stand trial. The appellant's rescheduled trial began the following morning, December 6, 2017.

Once a competency evaluation of the appellant was ordered on January 17, 2017, it was obvious that a criminal trial of the appellant could not be held until the court determined that the appellant was competent to stand trial. That determination was made on December 5, 2017. The appellant attempts to ensnare us, nonetheless, in the internal chronology of the evaluation process. That is uncharted territory for a Hicks analysis. Hicks is focused on the scheduling, postponing, and rescheduling of criminal trials. That is classic grist for the Hicks mill. Hicks is not concerned with the passage of time that may transpire between the various stages in the evaluation process. A Hicks analysis is not focused, e.g., on how long it takes to get a defendant into a mental health facility; with how long it may take to get a defendant transferred from one facility to another; with how many psychiatrists, psychologists, and other personnel are available and their respective workloads; with how long it may take to get test results; or how long it may take for a mental health facility to communicate its findings to the court. The Hicks analysis, deferred for the period of a competency evaluation, resumes when the defendant is back in the criminal justice system, to wit, eligible to be scheduled for a criminal trial.

Loath as we are to conflate the scheduling of a competency hearing with the scheduling of a criminal trial, we will indulge the appellant in one regard. Assuming, arguendo, that Hicks scrutiny was again operational when the court received Dr.

Hightower's report on September 25, 2017, that the appellant was competent to stand trial, the State would seem to be chargeable for the delay of one month and 26 days between October 10, 2017, and December 5, 2017. Such a modest delay, however, was clearly not an "inordinate delay" within the contemplation of Hicks. The 180-Day Rule was not violated in this case.

**Sixth Amendment Speedy Trial**

**A. Distinction Between 180-Day Rule And Constitutional Right**

Although the appellant merged his claims pursuant to the Hicks Rule and pursuant to the Sixth Amendment into a single contention, we have separated them into two contentions because of the widely divergent analyses they entail. Both, to be sure, are concerned with the trial scheduling calendar. Essentially beyond that point, however, they veer off in very different directions. A Hicks claim is not a junior varsity speedy trial claim.

The Sixth Amendment right is constitutional. The Hicks Rule is only statutory. It can be changed at any time at the whim of the Legislature or of the Court of Appeals (with an assist from the Rules Committee).[6] The guarantee of a speedy trial is a constitutional right vested in a criminal defendant personally. Any benefits received by a defendant from the Hicks Rule, on the other hand, are purely coincidental. See Marks v. State, 84 Md. App. 269, 277, 578 A.2d 828 (1990) ("[T]he benefits that the rule confers upon defendants are

---

[6] In 1979, for instance, the Hicks Rule was changed from a 120-Day Rule into a 180-Day Rule.

incidental."), <u>cert. denied</u>, 321 Md. 502, 583 A.2d 275 (1991). In <u>State v. Hicks</u>, 285 Md.

at 320, Chief Judge Murphy took note of the distinction.

> The time limits prescribed by Rule 746 are not, however, the measure of the Sixth Amendment right to a speedy trial. While <u>the rule</u> was adopted to facilitate the prompt disposition of criminal cases, it <u>stands on a different legal footing than the Sixth Amendment's constitutional right to a speedy trial.</u>

(Emphasis supplied).

In <u>State v. Frazier</u>, 298 Md. 422, 428, 470 A.2d 1269 (1984), Judge Eldridge

similarly wrote for the Court:

> This Court also stated in the <u>Hicks</u> opinion that <u>§ 591 and Rule 746 were not intended to be codifications of the constitutional speedy trial right but stand "on a different legal footing."</u>

(Emphasis supplied; citation omitted).

In <u>Tapscott v. State</u>, 106 Md. App. 109, 123, 664 A.2d 42 (1995), this Court also

observed:

> Appellant mistakenly asserts that his statutory right to a speedy trial was violated. <u>There is no statutory right to a speedy trial.</u> In <u>Marks v. State</u>, this court clearly explained that "the purpose of the 180 day rule is to protect the societal interest in the prompt trial of criminal cases, the benefits that the rule confers upon defendants are incidental." Consequently, <u>the mandate to the State to bring the case to trial no later than 180 days is not a speedy trial right of a defendant.</u>

(Emphasis supplied; citations omitted).

## B. A Multi-Factored Analysis

Since 1972, the Alpha and Omega of Sixth Amendment speedy trial analysis has

been the opinion of Justice Powell for the Supreme Court in <u>Barker v. Wingo</u>, 407 U.S.

514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). The now legendary four-factored balancing

test was presented in a nutshell.

> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, <u>we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.</u>

407 U.S. at 530 (emphasis supplied; footnote omitted).

## C. Length Of Delay

At the outset, the Supreme Court recognized the length-of-delay factor as a

triggering mechanism. Unless the delay is long enough to be "presumptively prejudicial,"

a reviewing court need not even waste its time engaging in any further analysis. "Length

of delay's" first function is to "provoke an inquiry."

> The length of the delay is to some extent <u>a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.</u> Nevertheless, because of the imprecision of the right to speedy trial, <u>the length of delay that will provoke such an inquiry</u> is necessarily dependent upon the peculiar circumstances of the case.

407 U.S. at 530–31 (emphasis supplied; footnote omitted).

The words "presumptively prejudicial" are generally used to assess the length of

delay as a threshold trigger to call for further examination pursuant to <u>Barker v. Wingo</u>.

They are not typically used to describe the length of delay in its other capacity as one of

the four factors in the ultimate analyses of the speedy trial merits.

The "length of delay" factor is of significant concern to us in this case. Our concern has nothing to do with the ultimate merits of this appellant's speedy trial claim. Our concern is that the inherent ambiguity of the phrase, designed as it is to serve two very distinct and different purposes, could lead to the abuse of the concept, inadvertently we would hope, in the heat of fervid advocacy.

This Court went out of its way in <u>Ratchford v. State</u>, 141 Md. App. 354, 785 A.2d 826 (2001), <u>cert. denied</u>, 368 Md. 241, 792 A.2d 1178 (2002), to warn of the dangers that lurk in the dual purposes of the length-of-delay measurement. One of the two purposes comes at the front end of the four-factored balancing test and is relatively low octane. The other purpose comes at the back end of the balancing process and packs significantly more punch.

> The "length of delay" between arrest and trial is <u>a term of art that serves two separate and distinct functions in a speedy trial analysis.</u> In its first function, <u>it identifies the threshold that must be crossed before any further analysis is called for.</u> Along the delay continuum, <u>the trigger of "constitutional dimensions" is not itself part of the ultimate merits</u> of a speedy trial claim. <u>It simply marks the minimal point, short of which a court will dismiss a claim summarily and will not waste its time even inquiring into such things</u> as reason for delay, demand-waiver, or prejudice. Beyond that minimal or triggering point, however, <u>the claim may not necessarily have merit, but it is worthy at least of thoughtful consideration.</u>

141 Md. App. at 358 (emphasis supplied).

The danger is that caselaw that could legitimately be cited for having found the lesser purpose may be miscited as authority for finding the greater purpose.

> <u>The defense bar</u>, however, <u>has a chronic tendency to conflate the two functions of "length of delay"</u> and to transform the mere procedural catalyst into a judicial pronouncement on the merits that takes on an apparent gravity

26

that was never intended. The phrase "constitutional dimensions" does, indeed, pack a potent rhetorical punch. Defense attorneys, therefore, frequently treat the preliminary finding that a delay is of "constitutional dimensions" as persuasive argument that there was a violation of the right to a speedy trial itself.

It is, of course, no such thing.

Id. (Emphasis supplied).

The problem is that "length of delay" may mean one thing at the front end of the ultimate balancing test but mean something quite different at the back end. If the subtle distinction is not meticulously maintained, the potential for abuse is rife.

"Length of delay" in one of its manifestations, moreover, is by no means the equivalent of "length of delay" in its other manifestation. For its procedural function, "length of delay" is the gross period of time between the arrest and the trial or the hearing on the motion. For its function as a factor on the merits, by contrast, the "length of delay" is the net period of time that may be chargeable to the State or to the court system as true "delay," some of which, depending on other circumstances, may be given great weight and some of which may be given only slight weight.

141 Md. App. at 360 (emphasis supplied).

In appellate brief, the appellant makes the following argument. He is not arguing that the Court should engage in a Barker v. Wingo balancing test. That was already taken for granted. Four cases are cited for the proposition that the time periods reflected in those four lengths-of-delay were all treated as being "presumptively prejudicial." The argument, however, was on the ultimate merits of the speedy trial issue.

Generally, courts have held that it is "presumptively prejudicial" for the prosecution or court system, or some combination of both, to cause a delay between the defendant's formal accusation and trial nearing twelve months or longer. Doggett, 505 U.S. at 652 n.1 (noting that, generally, delays approaching twelve months are "presumptively prejudicial"); see also Divver

27

v. State, 356 Md. 379, 389 (1999) (delay of one year and sixteen days raised a "presumption of prejudice"); Brady v. State, 291 Md. 261, 265 (1981) ("[T]he State candidly admits that the fourteen month delay . . . gives rise to a speedy trial claim of prima facie merit."); Epps v. State, 276 Md. 96, 111 (1975) (delay of one year and fourteen days was "presumptively prejudicial").

(Emphasis supplied).

Those periods of "presumptively prejudicial" delay would seem to dispose of the speedy trial issue on its ultimate merits. But do they? In Doggett v. United States, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992), the footnote that is cited goes on to "note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry." 505 U.S. at 652 n.1 (emphasis supplied). In Divver, 356 Md. at 389–90, the analysis of four cases was in the context of "requiring us to engage in the balancing procedure outlined in Barker[;]" a "speedy trial claim of prima facie merit[;]" and "of constitutional dimension so as to trigger the prescribed balancing test." (Emphasis supplied; internal quotation marks omitted). The quoted passage from Brady, 291 Md. at 265, concludes, "What remains is the application of the balancing test." (Emphasis supplied). The Epps v. State passage concluded that the delay in question was enough "to provoke inquiry into the other interrelated factors which go into the balance . . . of Barker v. Wingo." 276 Md. at 111 (emphasis supplied). Each of the citations was unequivocally applied to a "length of delay" being analyzed in its threshold or triggering capacity, although the passage from the appellate brief gave no express indication of such a limitation.

28

We admonish counsel to be very careful in using an ambiguous and dual-purposed factor such as "length of delay" without pinpointing precisely the purpose for which the term was being used in the cited case or in using a potently descriptive phrase such as "presumptively prejudicial" without identifying its precise context, lest counsel's message be misunderstood. We must always be wary of a term uttered in one context being misapplied in a different context.

In this case, the overall length of delay ran from July 14, 2016, when the appellant was arrested and a Statement of Charges was filed against him, to December 6, 2017, when the appellant was tried. That computes to a delay of 16 months and 22 days. That is, we hold, a delay that is "presumptively prejudicial," by which we mean simply that it is a delay of "constitutional dimensions" so as to trigger the four-factor balancing of Barker v. Wingo. Once that threshold has been crossed, we can say with Ratchford v. State, 141 Md. App. at 359:

> Once the Sixth Amendment merits are in play, the only response that need be made to the no longer necessary use of the phrase "constitutional dimensions" is, "Of course, it's of 'constitutional dimensions' or we wouldn't even be having this hearing."

(Emphasis supplied).

As we now turn to the length of delay in its other manifestation, as one of the factors on the ultimate merits, we are again guided by the Ratchford case.

> Once we are engaged in Barker v. Wingo's four-factored analysis, we view the "length of delay" in a different light. As far as the length of delay itself is concerned, what was sufficient to enable it to serve its first and triggering function may be of only minimal significance when it comes to its second function. Depending on which of its two functions is being served,

> we treat the "length of delay" very differently. As one of the four factors on the ultimate merits, <u>it is heavily influenced by the other three factors, particularly that of "reasons for the delay."</u>

<u>Id</u>. (Emphasis supplied). The length of delay is no longer "presumptively prejudicial." That threshold has been passed. It is, moreover, now largely controlled by the other factors, most especially the reason for the delay.

## D. Reason For The Delay

As <u>Ratchford</u> suggests, the length of delay in this case, as it bears on the ultimate speedy trial merits, is massively, indeed, critically, affected by the reason for the delay. In this case, there was only one delay of any constitutional significance. The reason for that delay is dispositive of the entire speedy trial claim.

As of the originally scheduled trial date of January 17, 2017, there had been no delay problem of any sort. The trial was still well within the <u>Hicks</u> Rule (Day 159 on the 180-Day calendar). The passage of time to that point was uncontestedly for the neutral reason of routine trial scheduling. No one was complaining about the scheduling in any way.

It was on January 17, 2017, at the express and exclusive request of defense counsel that Judge Hughes postponed the trial and ordered that the appellant be examined to determine if he was competent to stand trial. Defense counsel's request in that regard was fully vindicated when the ensuing competency examination showed that the appellant was indeed incompetent to stand trial. From that point forward, a trial date could not, as a matter of law, be rescheduled unless and until the appellant was legally adjudicated to be competent to stand trial. That did not happen until December 5, 2017. As a legal matter, of

course, the appellant was competent to stand trial not when his psychiatrist said so but only when the trial judge declared that to be so.

The delay for the entire incompetency saga, measured from January 17, 2017, was one of 10 months and 19 days. Even if, arguendo, we should opt to charge the State with responsibility for the delay in scheduling the final competency hearing from October 10, 2017, to December 5, 2017, that subtraction of one month and 26 days from the overall incompetency delay would be negligible.

That massive delay, moreover, is chargeable exclusively to the defense. It was requested by defense counsel. It was exclusively for the benefit of the defendant. Its result verified the fact that it benefitted the defendant by preventing the trial of one who was incompetent to stand trial. Judge Hughes never, sua sponte, suggested a competency hearing. The State, of course, stood unobtrusively by and never requested anything.

The appellant, to be sure, vigorously protested his counsel's request. This issue we have already fully analyzed and decided supra, under the subheading of "E. When Defendant And Defense Counsel Disagree." It would be self-evidently incongruous if the defense could both request a delay and then claim reversible error on the basis of the granting of that requested delay.

The entire incompetency episode, from start to finish, was attributable to the defense side of the trial table. The overarching reason for the delay, moreover, was not a matter of defense trial tactics. It was, far more seriously, a matter actually controlled by the appellant's medical and mental condition. This reason for the delay resolves the entire

31

speedy trial issue. The other factors are inconsequential. The appellant was not denied a constitutionally guaranteed speedy trial.

## A Ghost Contention:
## The Second Amendment's Right To Bear Arms

The appellant's fourth contention first appeared before us as a ghost contention. We were initially nonplussed as to whether it was sufficiently preserved to permit the appellant even to argue it on appeal. In appellate brief, the appellant, out of the blue, launched into an abstract discussion asserting that Maryland Code, Public Safety Article, Sect. 5–133, pursuant to which the appellant was convicted of the wrongful possession of a firearm, has been rendered unconstitutional by the Second Amendment of the United States Constitution.

Nowhere in the trial transcript was there any even remote reference to this unconstitutionality argument. The appellant did not cite any such reference in the transcript. Nor did he mention that he ever filed a possible pre-trial motion in this regard. There was no mention that the State was ever served with such a motion or that it ever responded to such a motion. There was no mention that such a motion was ever referred to a judge; no mention that a hearing was ever held on the motion; and no mention as to what disposition was ever made. The abstract Second Amendment argument simply appeared out of the blue in the middle of the appellant's brief. We could as readily have been asked to debate the applicability to the appellant's case of the United Nations Charter or of the Magna Charta. As it first appeared, the contention was completely adrift.

The State, however, has come to the rescue and has seen that the record has been supplemented. On April 4, 2017, after the appellant had been referred for a competency evaluation but before the first competency hearing on May 11, 2017, the appellant filed with the court a Motion To Dismiss Pursuant To The Second Amendment To The United States Constitution. The heart of the constitutional argument was as follows:

> 3. In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in the case of confrontation."
>
> 4. Subsequently, in <u>McDonald v. Chicago</u>, 561 U.S. 742 (2010), the Court held that the Second Amendment's protection of an individual's right to possess and carry firearms was incorporated against state and local governments through the Due Process Clause of the Fourteenth Amendment.
>
> 5. Recently, in <u>Caetano v. Massachusetts</u>, 136 S. Ct. 1027 (2016), the Court held that the right to bear arms extends to all forms of bearable firearms.
>
> 6. For these reasons, any United States citizen has an individual right to possess and carry firearms, regardless of whether they have been convicted of a crime.
> 7. This makes sense because the courts are presumed to have the wisdom to not let an individual roam free if they pose a threat. Stated otherwise, no court would knowingly allow a person convicted of a crime to interact freely with other citizens unless the court believed the person was, due to the sentence imposed, reformed and rehabilitated. <u>See Williams v. New York</u>, 337 U.S. 241, 248 (1949) ("Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence.").

The final relief sought was dismissal of the charges.

> 9. For these reasons, the first, second, third and fifth counts of the State's Indictment seek to violate Mr. Hogan's rights under the Second Amendment, thus the statutes upon which they are based are unconstitutional and the said counts should be dismissed.

On April 14, 2017, the State filed its State's Response To Defendant's Motion To Dismiss Pursuant To The Second Amendment To The United States Constitution. The State's Response quoted <u>District of Columbia v. Heller</u>, 554 U.S. at 626, as having pointed out that "'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]'" The Response also cited the Court of Appeals decision in <u>Williams v. State</u>, 417 Md. 479, 10 A.3d 1167 (2011):

> In <u>Williams v. State</u>, 417 Md. 479 (2011), the Court of Appeals found that the Second Amendment is not violated by the wear/carry/transport handgun prohibition under Maryland Criminal Law Code Annotated § 4–203. In that case, a distinction was made regarding handgun possession in one's home, which was not prohibited under 4–203, and in public, which was prohibited under 4–203. In the case at bar, the applicable statutory prohibition, PS 5–133, does prohibit the possession of a firearm whether it be within or outside of one's home. The Court's reasoning in <u>Williams</u>, however, would still carry over to the constitutionality of PS 5–133. The Court of Appeals in <u>Williams</u> reaffirms the holdings in both <u>Heller</u> and <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010), that even though the opinions safeguarded an individual's right of self-defense when possession in the home was an issue, the Supreme Court made it clear that regulatory schemes prohibiting handgun ownership by dangerous individuals, felons and the mentally ill, among other restrictions, are not violative of the Second Amendment, as applied to the States through the 14th Amendment. Maryland Public Safety Code Annotated § 5–133 is exactly the type of restrictive statute that is permitted under the Supreme Court holdings.

The Motion To Dismiss was submitted to Judge Hughes, who signed an order on April 21, 2017, denying it. There is no indication that there was any hearing on the Motion To Dismiss nor that legal memoranda were submitted by counsel. Assuming, <u>arguendo</u>, that this heretofore incorporeal apparition now looms palpably before us like the Spirit of

34

Christmas Present,[7] we hold that Judge Hughes was not in error in denying the Motion To Dismiss. This conviction will not imperil the "well regulated Militia." U.S. Const. Amend. II.

The very oddity of this contention provokes a sense of bafflement as to whether the contention was truly substantive or only spectral. Was what appeared to be before us really before us? The entire life span of this phase of the litigation was no more than a flash, from April 4 through April 21 of 2017. It was a flash, moreover, that happened off stage, apparently without a live word having been uttered by anyone in a courtroom. But for eleventh-hour heroics by the State to correct the record, this phase of the litigation would have suffered (or enjoyed) a premature burial. It would have been gone, and no one would have known that it ever happened. Theoretically, there would appear to be no reason why a dozen such abstract issues could not arise, reaching into a dozen far-flung corners of constitutional and non-constitutional law.

It is hard, however, to conceptualize as **a phase of the appellant's trial** a self-contained sub-litigation that occurs, from start to finish, during the time when the appellant himself was committed to a mental health hospital and was under a court-ordered evaluation to determine whether he was incompetent to stand trial. Could a significant stage of the appellant's trial take place before it had been determined that the appellant was competent to stand trial? Did not the appellant have a right to be there? Did not the appellant have a right both to be there and to be there competently? To what extent may an

---

[7] Charles Dickens, A Christmas Carol.

appellant's non-trial (and/or period of non-triability) serve, therefore, as a platform for deciding (and then appealing) a variety of issues not directly involved with the appellant's competency status? The appellant has offered us no guidance.

**Suppose The Allegedly "Plain Error" Is Not Plain**

The secondary charge on which the appellant was convicted in this case was the unlawful possession of ammunition by one forbidden to possess it. The ammunition possessed by the appellant consisted of two bullets, both of which were loaded into the unlawfully possessed handgun. Two bullets might seem trivial, but in rebuttal argument to the jury, the State was making the point that two bullets (or even one bullet) would be enough to justify a conviction.

> Regarding the bullets, there are two bullets. There are two bullets in the evidence and there are two bullets that were in the gun. And that is all you need is two bullets.

> Were there more? You have a piece of paper in the evidence that the Defendant referred to as an inventory. That inventory was of the living room and the kitchen. It wasn't of the rest of the house. It was just an inventory of what was in the living room and kitchen. And that is in evidence. And there is no bullets on there, there were no other bullets in the living room and the kitchen. But it doesn't matter because we only needed those two anyway. We only needed one.

At that point, no one made any comment and the Assistant State's Attorney went on uninterruptedly with her rebuttal argument. Post-trial, however, in the course of a hearing on the appellant's Motion For A New Trial, the appellant suddenly realized that in that segment of rebuttal argument there lurked a clear and plain instance of prosecutorial

misconduct in which the Assistant State's Attorney had "flagrantly lied" to the jury about the state of the evidence. "Flagrantly lied." That's a harsh charge.

Although it might initially appear that the appellant had failed to make a timely objection and had thereby failed to preserve this objection for appellate review, the appellant now claims that raising the objection in the course of the hearing on the Motion For A New Trial sufficed for preservation purposes. Cases dealing with the preservation requirement, on the other hand, make it incontrovertibly clear that a primary function of the timely objection requirement is to permit the trial judge to correct an obvious error while the jury is still in the box before a verdict has been rendered. That was self-evidently no longer possible at a hearing on a post-trial motion. The appellant's objection to the prosecutor's rebuttal argument has self-evidently not been preserved for appellate review.

In the alternative, the appellant asks that we take notice of plain error. In the exercise of our discretion, we decline to do so. That is all that need be said on the subject. The appellant's argument on the subject is so strained, however, that we cannot refrain from making at least brief passing comment on it.

We are cognizant of the concept of an appellate court sometimes taking notice of unpreserved "plain error." Does that concept embrace, however, the taking notice of unpreserved "arcane error?" In <u>Wieland v. State</u>, 101 Md. App. 1, 33, 643 A.2d 446 (1994), we clearly said, "No."

The notion of <u>plain error simply does not embrace arcane error.</u>
(Emphasis supplied). We elaborated more fully on that answer.

The failure to give the instruction in issue might, therefore, have technically been error. <u>By no stretch of the imagination</u>, however, <u>could such an error</u>, if it be error, <u>be deemed "plain."</u> <u>It is an issue that has never been the subject of an appellate decision in Maryland. At most, it has been alluded to once in passing dicta. It is an issue of first impression.</u> It involves, moreover, <u>a very subtle nuance of mens rea analysis</u> which is <u>on the very cutting edge of legal thought.</u> If error it was, <u>it certainly was not plain</u>. The <u>qualifying</u> adjective "plain" in the phrase "plain error" is not without meaning or content.

<u>Id</u>. (Emphasis supplied; citations omitted).

<u>Stockton v. State</u>, 107 Md. App. 395, 398, 668 A.2d 936 (1995), <u>cert. denied</u>, 342 Md. 116, 673 A.2d 707 (1996), spoke to the same effect.

If words have meaning . . . even subtle error presumably does not constitute <u>plain</u> error. Otherwise the word "error" would be enough, standing alone, without the qualifying requirement that such error be "plain."

(Emphasis in original). The possibility of noticing "plain error" does not exist in order to reach out and to solve involved and intricate legal problems. It exists to correct glaring miscarriages of justice. Those miscarriages are "plain."

As we look for the needle of "plain error" in the haystack of the rebuttal argument, we are sorely challenged. The search is convolutedly subtle and its theory is enigmatic. The existence of an alleged error depends upon a defense thesis that is by no means solid. The thesis is that the appellant was not guilty of the unlawful possession of a firearm if he was, essentially until the last minute, oblivious to the fact that he possessed the firearm. His, however, was a crime of simple possession, and he plays a bit fast and loose with the <u>mens rea</u> of such a crime. We will discuss this more fully <u>infra</u> in dealing with the appellant's final contention.

38

A crime of simple possession does not require any specific intent nor does it require any special scienter. McNeal v. State, 200 Md. App. 510, 524, 28 A.3d 88 (2011), aff'd, 426 Md. 455, 44 A.3d 982 (2012). It is essentially a malum prohibitum, if not quite. Simple possession is a general intent crime. The appellant need only be aware that he is then in possession of the forbidden item. This appellant was clearly so aware as he waved the gun about in the presence of Sergeant Lambert. He knew it as he said, "Hell, no," and retreated into his house, and slammed the door. That is all that is required. There is no requirement that he was necessarily aware of his possession of the firearm an hour earlier or a week earlier. The defense belief in "plain error," however, depends upon this defense thesis that the appellant was innocent of unlawful possession if he was unaware of the presence of the firearm in his house on the days and weeks preceding the confrontation of July 14, 2016.

The defense thesis of innocence then went one step further and conjectured that an earlier awareness of the very presence of the gun would have suggested the appellant's at least occasional use of the gun. The ensuing conjecture is that if the appellant knew of the existence of the gun and at least periodically used the gun, there would be circumstantial evidence of such use. The circumstantial evidence supporting or negating such awareness and use would be the tell-tale presence or absence of ammunition about the house.

The appellant's suggestion of "plain error" then turns to the presence or absence of such circumstantial evidence. After the appellant was arrested on July 14, 2016, the police obtained a search warrant and searched his house. The inventory of items seized, a copy of which was given to the appellant, listed an item of evidence seized from the living room

39

and an item of evidence seized from the kitchen. Neither of those items were bullets. The only bullets seized were the two bullets found in the handgun itself.

Clearly, what the defense wanted to do was to make the argument that if no bullets were found anywhere in the house, that would be circumstantial evidence supporting the inference that the appellant had no awareness of the presence of the firearm. The State, for its part, never gainsaid that argument. It never said, or even suggested, that bullets had been found somewhere in the house other than in the kitchen and living room. By pointing out that the inventory only spoke with respect to the living room and the kitchen, however, the State weakened the argument that the defense wanted to make. The inventory did not oppose the defense argument. It simply did not speak with respect to other rooms in the house one way or the other. The other rooms in the house may indeed have been as free of bullets as were the living room and the kitchen. That was almost certainly the case or the inventory would have said so. What the inventory failed to do, the appellant now complains, was affirmatively to support the defense argument based on circumstantial evidence. With respect to inventories, it is interesting to note that Maryland Rule 4–601, dealing with Search Warrants says, in subsection (e)(1):

> (1) An officer shall make, verify, and sign <u>a written inventory of all property seized</u> under a search warrant, including a general description of electronically stored information received pursuant to the warrant in electronic, disk, paper, or other form.

(Emphasis supplied). What the inventory must list, as was properly done in this case, is the property that was actually seized, not the rooms that were searched. To describe the scope of the search is not the function of an inventory list.

In any event, we find it inconceivable that so strained and attenuated an allegation of error could ever be described as "plain." It takes pages even to describe it. It is more than arcane; it is almost invisible. It was hardly an extraordinary miscarriage of justice. That fortunately is beside the point, however, for our basic decision, announced before engaging in this rambling dicta, remains that, in our discretion, we decline to notice this unpreserved objection.

## The Mens Rea Of Simple Possession

The appellant's final contention is that Judge Stansfield erroneously refused to give his requested instruction to the jury to the effect that the appellant could not be convicted of illegally possessing a firearm if his possession was designed solely to hand over the firearm to the police in order to comply with the law. With respect to such a contention, this case is the mirror image of McNeal v. State, 200 Md. App. 510, 28 A.3d 88 (2011), aff'd, 426 Md. 455, 44 A.3d 982 (2012). The defendant in McNeal was attempting to interpose precisely the same defense to the possession of a firearm charge that the appellant here is now advancing. The requested jury instruction in McNeal is indistinguishable from the instruction the appellant requested here.

> I would now like to explain to you the doctrine of "mens rea." [McNeal] has explained to you that he found the weapon just prior to his arrest, and that he picked it up intending to turn it into the police department, and also to see to it that it did not cause injury to any of the children in the area. The doctrine of mens rea, or wrongful intent, requires that a defendant have a wrongful intent before he can be convicted of a criminal offense.

200 Md. App. at 523 (emphasis supplied).

41

The trial judge in <u>McNeal</u> declined to give the requested instruction, just as Judge Stansfield declined to give it in this case. The defendant's contention in <u>McNeal</u> foreshadowed precisely the appellant's contention here.

> McNeal contends that "<u>it was error</u> [for the court] to refuse his counsel's requested instruction," because "[t]he instructions that were given did not adequately convey to the jury that [McNeal] should not have been convicted of . . . the possession of a firearm . . . if he intended to possess . . . it only for the purpose of turning it over to the police."

200 Md. App. at 523–24 (emphasis supplied).

This Court, speaking through Judge Salmon, rejected the contention there, explaining that the crime of simple unlawful possession did not include the element of "wrongful intent," as urged by the appellant here.

> We reject that contention. "In order <u>for</u> . . . <u>evidence supporting [a] handgun possession conviction to be sufficient, it must demonstrate either directly or inferentially that [the defendant] exercised some dominion or control over the</u>" handgun. <u>Parker v. State</u>, 402 Md. 372, 407, 936 A.2d 862 (2007). . . . "<u>Wrongful intent" is not an element of unlawful possession</u> of a regulated firearm as defined by PS Section 5–133(b), <u>supra</u>, and therefore <u>the court did not err in omitting the element from its instructions to the jury.</u>

200 Md. App. at 524 (emphasis supplied).

The <u>mens rea</u> of simple unlawful possession requires only the defendant's awareness that he is in actual possession of the item he is not permitted to possess.

> The charge of which appellant was convicted did require proof of <u>mens rea</u>, but not the <u>mens rea</u> appellant suggests. Although PS Section 5–133(b) is silent concerning the <u>mens rea</u> required, <u>the Court of Appeals has held that a "possession conviction normally requires knowledge of the illicit item."</u> <u>Parker</u>, 402 Md. at 407, 936 A.2d 862. Here the court instructed the jury in conformity with <u>Parker</u>, when it said: "<u>the State has the obligation to prove . . . knowledge on the part of</u>" McNeal that "<u>he was in possession of a handgun.</u>"

42

Id. (Emphasis supplied). See also Parker v. State, 402 Md. 372, 407, 936 A.2d 862 (2007).

The appellant acknowledges that McNeal v. State poses a precedential problem for him. His solution to the problem is to reject McNeal v. State as binding authority. "The problem with the holding," the appellant has decided, "is that it is not well reasoned. The above passage from McNeal constitutes the entirety of this Court's analysis on the subject. Clearly this Court evaded addressing the why—why should the law punish a person for trying to comply with it?" We reject the appellant's rejection of McNeal v. State and his conclusion that we should follow instead United States v. Mason, 233 F.3d 619 (D.C. Cir. 2000).

We note, moreover, that the jury instruction given by Judge Stansfield as to the mens rea of simple possession was taken verbatim from that recommended by the Maryland State Bar Association, Maryland Pattern Jury Instructions: Criminal, 4:35.6. See Johnson v. State, 223 Md. App. 128, 152, 115 A.3d 668 ("[I]t is well-established that a trial court is strongly encouraged to use the pattern jury instructions."), cert. denied, 445 Md. 6, 122 A.3d 975 (2015); Yates v. State, 202 Md. App. 700, 723, 33 A.3d 1071 (2011) ("This Court has recommended that trial judges use the pattern instructions."), aff'd, 429 Md. 112, 55 A.3d 25 (2012); Green v. State, 127 Md. App 758, 771, 736 A.2d 450 (1999) ("[T]he wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions.").

We also note that at trial, the appellant argued to the court that because the "Maryland Court of Appeals has never ruled on this issue, it is an open question in

43

Maryland." That statement is absolutely incorrect, and we take umbrage at the disdaining of the authority of this Court to promulgate Maryland law. In the absence of a holding by the Court of Appeals of Maryland or by the Supreme Court of the United States to the contrary, the holdings of this Court are the authoritatively binding law of Maryland. Pursuant to the authoritative holding of McNeal v. State, the correctness of Judge Stansfield's instruction to the jury on the mens rea of a crime of simple possession is hereby affirmed.

Incidentally, we may now note that the appellant's argument in his preceding contention that an unpreserved but "plain error" occurred that the Court should choose to notice completely depended upon the defense theory of innocence that we have now rejected in resolving the present contention. Our dicta in discussing that earlier contention observed that the ostensible "plain error" there was not "plain." McNeal v. State and this present holding would now heap Pelion upon Ossa by adding that the ostensible "plain error" was also not "error." Thus, we not only choose not to take notice, but we can't— even if we wanted to. It is hard to take "plain error" notice of something that was both esoteric and correct.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**